(Slip Opinion) OCTOBER TERM, 2015 1

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## BIRCHFIELD *v.* NORTH DAKOTA

### CERTIORARI TO THE SUPREME COURT OF NORTH DAKOTA

No. 14–1468. Argued April 20, 2016—Decided June 23, 2016*

To fight the serious harms inflicted by drunk drivers, all States have laws that prohibit motorists from driving with a blood alcohol concentration (BAC) exceeding a specified level. BAC is typically determined through a direct analysis of a blood sample or by using a machine to measure the amount of alcohol in a person's breath. To help secure drivers' cooperation with such testing, the States have also enacted "implied consent" laws that require drivers to submit to BAC tests. Originally, the penalty for refusing a test was suspension of the motorist's license. Over time, however, States have toughened their drunk-driving laws, imposing harsher penalties on recidivists and drivers with particularly high BAC levels. Because motorists who fear these increased punishments have strong incentives to reject testing, some States, including North Dakota and Minnesota, now make it a crime to refuse to undergo testing.

In these cases, all three petitioners were arrested on drunk-driving charges. The state trooper who arrested petitioner Danny Birchfield advised him of his obligation under North Dakota law to undergo BAC testing and told him, as state law requires, that refusing to submit to a blood test could lead to criminal punishment. Birchfield refused to let his blood be drawn and was charged with a misdemeanor violation of the refusal statute. He entered a conditional guilty plea but argued that the Fourth Amendment prohibited criminalizing his refusal to submit to the test. The State District Court re-

—————

*Together with No. 14–1470, *Bernard* v. *Minnesota*, on certiorari to the Supreme Court of Minnesota, and No. 14–1507, *Beylund* v. *Levi, Director, North Dakota Department of Transportation*, also on certiorari to the Supreme Court of North Dakota.

jected his argument, and the State Supreme Court affirmed.

After arresting petitioner William Robert Bernard, Jr., Minnesota police transported him to the station. There, officers read him Minnesota's implied consent advisory, which like North Dakota's informs motorists that it is a crime to refuse to submit to a BAC test. Bernard refused to take a breath test and was charged with test refusal in the first degree. The Minnesota District Court dismissed the charges, concluding that the warrantless breath test was not permitted under the Fourth Amendment. The State Court of Appeals reversed, and the State Supreme Court affirmed.

The officer who arrested petitioner Steve Michael Beylund took him to a nearby hospital. The officer read him North Dakota's implied consent advisory, informing him that test refusal in these circumstances is itself a crime. Beylund agreed to have his blood drawn. The test revealed a BAC level more than three times the legal limit. Beylund's license was suspended for two years after an administrative hearing, and on appeal, the State District Court rejected his argument that his consent to the blood test was coerced by the officer's warning. The State Supreme Court affirmed.

*Held*:

1. The Fourth Amendment permits warrantless breath tests incident to arrests for drunk driving but not warrantless blood tests. Pp. 13–36.

(a) Taking a blood sample or administering a breath test is a search governed by the Fourth Amendment. See *Skinner* v. *Railway Labor Executives' Assn.*, 489 U. S. 602, 616–617; *Schmerber* v. *California*, 384 U. S. 757, 767–768. These searches may nevertheless be exempt from the warrant requirement if they fall within, as relevant here, the exception for searches conducted incident to a lawful arrest. This exception applies categorically, rather than on a case-by-case basis. *Missouri* v. *McNeely*, 569 U. S. ___, ___, n. 3. Pp. 14–16.

(b) The search-incident-to-arrest doctrine has an ancient pedigree that predates the Nation's founding, and no historical evidence suggests that the Fourth Amendment altered the permissible bounds of arrestee searches. The mere "fact of the lawful arrest" justifies "a full search of the person." *United States* v. *Robinson*, 414 U. S. 218, 235. The doctrine may also apply in situations that could not have been envisioned when the Fourth Amendment was adopted. In *Riley* v. *California*, 573 U. S. ___, the Court considered how to apply the doctrine to searches of an arrestee's cell phone. Because founding era guidance was lacking, the Court determined "whether to exempt [the] search from the warrant requirement 'by assessing, on the one hand, the degree to which it intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legit-

imate governmental interests.' " *Id.,* at \_\_\_. The same mode of analysis is proper here because the founding era provides no definitive guidance on whether blood and breath tests should be allowed incident to arrest. Pp. 16–20.

(c) The analysis begins by considering the impact of breath and blood tests on individual privacy interests. Pp. 20–23.

(1) Breath tests do not "implicat[e] significant privacy concerns." *Skinner*, 489 U. S., at 626. The physical intrusion is almost negligible. The tests "do not require piercing the skin" and entail "a minimum of inconvenience." *Id.,* at 625. Requiring an arrestee to insert the machine's mouthpiece into his or her mouth and to exhale "deep lung" air is no more intrusive than collecting a DNA sample by rubbing a swab on the inside of a person's cheek, *Maryland* v. *King*, 569 U. S. \_\_\_, \_\_\_, or scraping underneath a suspect's fingernails, *Cupp* v. *Murphy*, 412 U. S. 291. Breath tests, unlike DNA samples, also yield only a BAC reading and leave no biological sample in the government's possession. Finally, participation in a breath test is not likely to enhance the embarrassment inherent in any arrest. Pp. 20–22.

(2) The same cannot be said about blood tests. They "require piercing the skin" and extract a part of the subject's body, *Skinner*, *supra,* at 625, and thus are significantly more intrusive than blowing into a tube. A blood test also gives law enforcement a sample that can be preserved and from which it is possible to extract information beyond a simple BAC reading. That prospect could cause anxiety for the person tested. Pp. 22–23.

(d) The analysis next turns to the States' asserted need to obtain BAC readings. Pp. 23–33.

(1) The States and the Federal Government have a "paramount interest . . . in preserving [public highway] safety," *Mackey* v. *Montrym*, 443 U. S. 1, 17; and States have a compelling interest in creating "deterrent[s] to drunken driving," a leading cause of traffic fatalities and injuries, *id.,* at 18. Sanctions for refusing to take a BAC test were increased because consequences like license suspension were no longer adequate to persuade the most dangerous offenders to agree to a test that could lead to severe criminal sanctions. By making it a crime to refuse to submit to a BAC test, the laws at issue provide an incentive to cooperate and thus serve a very important function. Pp. 23–25.

(2) As for other ways to combat drunk driving, this Court's decisions establish that an arresting officer is not obligated to obtain a warrant before conducting a search incident to arrest simply because there might be adequate time in the particular circumstances to obtain a warrant. The legality of a search incident to arrest must be

judged on the basis of categorical rules. See *e.g., Robinson*, *supra,* at 235. *McNeely, supra*, at ___, distinguished. Imposition of a warrant requirement for every BAC test would likely swamp courts, given the enormous number of drunk-driving arrests, with little corresponding benefit. And other alternatives—*e.g.,* sobriety checkpoints and ignition interlock systems—are poor substitutes. Pp. 25–30.

(3) Bernard argues that warrantless BAC testing cannot be justified as a search incident to arrest because that doctrine aims to prevent the arrestee from destroying evidence, while the loss of blood alcohol evidence results from the body's metabolism of alcohol, a natural process not controlled by the arrestee. In both instances, however, the State is justifiably concerned that evidence may be lost. The State's general interest in "evidence preservation" or avoiding "the loss of evidence," *Riley, supra,* at ___, readily encompasses the metabolization of alcohol in the blood. Bernard's view finds no support in *Chimel* v. *California,* 395 U. S. 752, 763, *Schmerber,* 384 U. S., at 769, or *McNeely, supra,* at ___. Pp. 30–33.

(e) Because the impact of breath tests on privacy is slight, and the need for BAC testing is great, the Fourth Amendment permits warrantless breath tests incident to arrests for drunk driving. Blood tests, however, are significantly more intrusive, and their reasonableness must be judged in light of the availability of the less invasive alternative of a breath test. Respondents have offered no satisfactory justification for demanding the more intrusive alternative without a warrant. In instances where blood tests might be preferable—*e.g.,* where substances other than alcohol impair the driver's ability to operate a car safely, or where the subject is unconscious—nothing prevents the police from seeking a warrant or from relying on the exigent circumstances exception if it applies. Because breath tests are significantly less intrusive than blood tests and in most cases amply serve law enforcement interests, a breath test, but not a blood test, may be administered as a search incident to a lawful arrest for drunk driving. No warrant is needed in this situation. Pp. 33–35.

2. Motorists may not be criminally punished for refusing to submit to a blood test based on legally implied consent to submit to them. It is one thing to approve implied-consent laws that impose civil penalties and evidentiary consequences on motorists who refuse to comply, but quite another for a State to insist upon an intrusive blood test and then to impose criminal penalties on refusal to submit. There must be a limit to the consequences to which motorists may be deemed to have consented by virtue of a decision to drive on public roads. Pp. 36–37.

3. These legal conclusions resolve the three present cases. Birchfield was criminally prosecuted for refusing a warrantless blood

Syllabus

draw, and therefore the search that he refused cannot be justified as a search incident to his arrest or on the basis of implied consent. Because there appears to be no other basis for a warrantless test of Birchfield's blood, he was threatened with an unlawful search and unlawfully convicted for refusing that search. Bernard was criminally prosecuted for refusing a warrantless breath test. Because that test was a permissible search incident to his arrest for drunk driving, the Fourth Amendment did not require officers to obtain a warrant prior to demanding the test, and Bernard had no right to refuse it. Beylund submitted to a blood test after police told him that the law required his submission. The North Dakota Supreme Court, which based its conclusion that Beylund's consent was voluntary on the erroneous assumption that the State could compel blood tests, should reevaluate Beylund's consent in light of the partial inaccuracy of the officer's advisory. Pp. 37–38.

No. 14–1468, 2015 ND 6, 858 N. W. 2d 302, reversed and remanded; No. 14–1470, 859 N. W. 2d 762, affirmed; No. 14–1507, 2015 ND 18, 859 N. W. 2d 403, vacated and remanded.

ALITO, J., delivered the opinion of the Court, in which ROBERTS, C. J, and KENNEDY, BREYER, and KAGAN, JJ., joined. SOTOMAYOR, J., filed an opinion concurring in part and dissenting in part, in which GINSBURG, J., joined. THOMAS, J., filed an opinion concurring in the judgment in part and dissenting in part.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

_____

Nos. 14–1468, 14–1470, and 14–1507

_____

### DANNY BIRCHFIELD, PETITIONER
14–1468 *v.*
### NORTH DAKOTA;

ON WRIT OF CERTIORARI TO THE SUPREME COURT OF
NORTH DAKOTA


### WILLIAM ROBERT BERNARD, JR., PETITIONER
14–1470 *v.*
### MINNESOTA; AND

ON WRIT OF CERTIORARI TO THE SUPREME COURT OF
MINNESOTA


### STEVE MICHAEL BEYLUND, PETITIONER
14–1507 *v.*
### GRANT LEVI, DIRECTOR, NORTH DAKOTA DEPARTMENT OF TRANSPORTATION

ON WRIT OF CERTIORARI TO THE SUPREME COURT OF
NORTH DAKOTA


[June 23, 2016]

JUSTICE ALITO delivered the opinion of the Court.

Drunk drivers take a grisly toll on the Nation's roads, claiming thousands of lives, injuring many more victims, and inflicting billions of dollars in property damage every

year. To fight this problem, all States have laws that prohibit motorists from driving with a blood alcohol concentration (BAC) that exceeds a specified level. But determining whether a driver's BAC is over the legal limit requires a test, and many drivers stopped on suspicion of drunk driving would not submit to testing if given the option. So every State also has long had what are termed "implied consent laws." These laws impose penalties on motorists who refuse to undergo testing when there is sufficient reason to believe they are violating the State's drunk-driving laws.

In the past, the typical penalty for noncompliance was suspension or revocation of the motorist's license. The cases now before us involve laws that go beyond that and make it a crime for a motorist to refuse to be tested after being lawfully arrested for driving while impaired. The question presented is whether such laws violate the Fourth Amendment's prohibition against unreasonable searches.

I

The problem of drunk driving arose almost as soon as motor vehicles came into use. See J. Jacobs, Drunk Driving: An American Dilemma 57 (1989) (Jacobs). New Jersey enacted what was perhaps the Nation's first drunk-driving law in 1906, 1906 N. J. Laws pp. 186, 196, and other States soon followed. These early laws made it illegal to drive while intoxicated but did not provide a statistical definition of intoxication. As a result, prosecutors normally had to present testimony that the defendant was showing outward signs of intoxication, like imbalance or slurred speech. R. Donigan, Chemical Tests and the Law 2 (1966) (Donigan). As one early case put it, "[t]he effects resulting from the drinking of intoxicating liquors are manifested in various ways, and before any one can be shown to be under the influence of intoxicating liquor it is

necessary for some witness to prove that some one or more of these effects were perceptible to him." *State* v. *Noble*, 119 Ore. 674, 677, 250 P. 833, 834 (1926).

The 1930's saw a continued rise in the number of motor vehicles on the roads, an end to Prohibition, and not coincidentally an increased interest in combating the growing problem of drunk driving. Jones, Measuring Alcohol in Blood and Breath for Forensic Purposes—A Historical Review, 8 For. Sci. Rev. 13, 20, 33 (1996) (Jones). The American Medical Association and the National Safety Council set up committees to study the problem and ultimately concluded that a driver with a BAC of 0.15% or higher could be presumed to be inebriated. Donigan 21–22. In 1939, Indiana enacted the first law that defined presumptive intoxication based on BAC levels, using the recommended 0.15% standard. 1939 Ind. Acts p. 309; Jones 21. Other States soon followed and then, in response to updated guidance from national organizations, lowered the presumption to a BAC level of 0.10%. Donigan 22–23. Later, States moved away from mere presumptions that defendants might rebut, and adopted laws providing that driving with a 0.10% BAC or higher was *per se* illegal. Jacobs 69–70.

Enforcement of laws of this type obviously requires the measurement of BAC. One way of doing this is to analyze a sample of a driver's blood directly. A technician with medical training uses a syringe to draw a blood sample from the veins of the subject, who must remain still during the procedure, and then the sample is shipped to a separate laboratory for measurement of its alcohol concentration. See 2 R. Erwin, Defense of Drunk Driving Cases §§17.03–17.04 (3d ed. 2015) (Erwin). Although it is possible for a subject to be forcibly immobilized so that a sample may be drawn, many States prohibit drawing blood from a driver who resists since this practice helps "to avoid violent confrontations." *South Dakota* v. *Neville*,

459 U. S. 553, 559 (1983).

The most common and economical method of calculating BAC is by means of a machine that measures the amount of alcohol in a person's breath. National Highway Traffic Safety Admin. (NHTSA), E. Haire, W. Leaf, D. Preusser, & M. Solomon, Use of Warrants to Reduce Breath Test Refusals: Experiences from North Carolina 1 (No. 811461, Apr. 2011). One such device, called the "Drunkometer," was invented and first sold in the 1930's. Note, 30 N. C. L. Rev. 302, 303, and n. 10 (1952). The test subject would inflate a small balloon, and then the test analyst would release this captured breath into the machine, which forced it through a chemical solution that reacted to the presence of alcohol by changing color. *Id.,* at 303. The test analyst could observe the amount of breath required to produce the color change and calculate the subject's breath alcohol concentration and by extension, BAC, from this figure. *Id.,* at 303–304. A more practical machine, called the "Breathalyzer," came into common use beginning in the 1950's, relying on the same basic scientific principles. 3 Erwin §22.01, at 22–3; Jones 34.

Over time, improved breath test machines were developed. Today, such devices can detect the presence of alcohol more quickly and accurately than before, typically using infrared technology rather than a chemical reaction. 2 Erwin §18A.01; Jones 36. And in practice all breath testing machines used for evidentiary purposes must be approved by the National Highway Traffic Safety Administration. See 1 H. Cohen & J. Green, Apprehending and Prosecuting the Drunk Driver §7.04[7] (LexisNexis 2015). These machines are generally regarded as very reliable because the federal standards require that the devices produce accurate and reproducible test results at a variety of BAC levels, from the very low to the very high. 77 Fed. Reg. 35747 (2012); 2 Erwin §18.07; Jones 38; see also *California* v. *Trombetta*, 467 U. S. 479, 489 (1984).

Measurement of BAC based on a breath test requires the cooperation of the person being tested. The subject must take a deep breath and exhale through a mouthpiece that connects to the machine. Berger, How Does it Work? Alcohol Breath Testing, 325 British Medical J. 1403 (2002) (Berger). Typically the test subject must blow air into the device "'for a period of several seconds'" to produce an adequate breath sample, and the process is sometimes repeated so that analysts can compare multiple samples to ensure the device's accuracy. *Trombetta, supra,* at 481; see also 2 Erwin §21.04[2][b](L), at 21–14 (describing the Intoxilyzer 4011 device as requiring a 12-second exhalation, although the subject may take a new breath about halfway through).

Modern breath test machines are designed to capture so-called "deep lung" or alveolar air. *Trombetta, supra,* at 481. Air from the alveolar region of the lungs provides the best basis for determining the test subject's BAC, for it is in that part of the lungs that alcohol vapor and other gases are exchanged between blood and breath. 2 Erwin §18.01[2][a], at 18–7.

When a standard infrared device is used, the whole process takes only a few minutes from start to finish. Berger 1403; 2 Erwin §18A.03[2], at 18A–14. Most evidentiary breath tests do not occur next to the vehicle, at the side of the road, but in a police station, where the controlled environment is especially conducive to reliable testing, or in some cases in the officer's patrol vehicle or in special mobile testing facilities. NHTSA, A. Berning et al., Refusal of Intoxication Testing: A Report to Congress 4, and n. 5 (No. 811098, Sept. 2008).

Because the cooperation of the test subject is necessary when a breath test is administered and highly preferable when a blood sample is taken, the enactment of laws defining intoxication based on BAC made it necessary for

States to find a way of securing such cooperation.[1]  So-called "implied consent" laws were enacted to achieve this result.  They provided that cooperation with BAC testing was a condition of the privilege of driving on state roads and that the privilege would be rescinded if a suspected drunk driver refused to honor that condition.  Donigan 177.  The first such law was enacted by New York in 1953, and many other States followed suit not long thereafter. *Id.,* at 177–179.  In 1962, the Uniform Vehicle Code also included such a provision.  *Id.,* at 179.  Today, "all 50 States have adopted implied consent laws that require motorists, as a condition of operating a motor vehicle within the State, to consent to BAC testing if they are arrested or otherwise detained on suspicion of a drunk-driving offense." *Missouri* v. *McNeely*, 569 U. S. ___, ___ (2013) (plurality opinion) (slip op., at 18).  Suspension or revocation of the motorist's driver's license remains the standard legal consequence of refusal.  In addition, evidence of the motorist's refusal is admitted as evidence of likely intoxication in a drunk-driving prosecution.  See *ibid.*

In recent decades, the States and the Federal Government have toughened drunk-driving laws, and those efforts have corresponded to a dramatic decrease in alcohol-related fatalities.  As of the early 1980's, the number of annual fatalities averaged 25,000; by 2014, the most recent year for which statistics are available, the number had fallen to below 10,000.  Presidential Commission on Drunk Driving 1 (Nov. 1983); NHTSA, Traffic Safety Facts, 2014 Data, Alcohol-Impaired Driving 2 (No. 812231, Dec. 2015) (NHTSA, 2014 Alcohol-Impaired Driving).  One

—————

[1] In addition, BAC may be determined by testing a subject's urine, which also requires the test subject's cooperation.  But urine tests appear to be less common in drunk-driving cases than breath and blood tests, and none of the cases before us involves one.

legal change has been further lowering the BAC standard from 0.10% to 0.08%. See 1 Erwin, §2.01[1], at 2–3 to 2–4. In addition, many States now impose increased penalties for recidivists and for drivers with a BAC level that exceeds a higher threshold. In North Dakota, for example, the standard penalty for first-time drunk-driving offenders is license suspension and a fine. N. D. Cent. Code Ann. §39–08–01(5)(a)(1) (Supp. 2015); §39–20–04.1(1). But an offender with a BAC of 0.16% or higher must spend at least two days in jail. §39–08–01(5)(a)(2). In addition, the State imposes increased mandatory minimum sentences for drunk-driving recidivists. §§39–08–01(5)(b)–(d).

Many other States have taken a similar approach, but this new structure threatened to undermine the effectiveness of implied consent laws. If the penalty for driving with a greatly elevated BAC or for repeat violations exceeds the penalty for refusing to submit to testing, motorists who fear conviction for the more severely punished offenses have an incentive to reject testing. And in some States, the refusal rate is high. On average, over one-fifth of all drivers asked to submit to BAC testing in 2011 refused to do so. NHTSA, E. Namuswe, H. Coleman, & A. Berning, Breath Test Refusal Rates in the United States—2011 Update 1 (No. 811881, Mar. 2014). In North Dakota, the refusal rate for 2011 was a representative 21%. *Id.,* at 2. Minnesota's was below average, at 12%. *Ibid.*

To combat the problem of test refusal, some States have begun to enact laws making it a crime to refuse to undergo testing. Minnesota has taken this approach for decades. See 1989 Minn. Laws p. 1658; 1992 Minn. Laws p. 1947. And that may partly explain why its refusal rate now is below the national average. Minnesota's rate is also half the 24% rate reported for 1988, the year before its first criminal refusal law took effect. See Ross, Simon, Cleary, Lewis, & Storkamp, Causes and Consequences of Implied Consent Refusal, 11 Alcohol, Drugs and Driving 57, 69

(1995). North Dakota adopted a similar law, in 2013, after a pair of drunk-driving accidents claimed the lives of an entire young family and another family's 5- and 9-year-old boys.[2]  2013 N. D. Laws pp. 1087–1088 (codified at §§39–08–01(1)–(3)). The Federal Government also encourages this approach as a means for overcoming the incentive that drunk drivers have to refuse a test. NHTSA, Refusal of Intoxication Testing, at 20.

## II
### A

Petitioner Danny Birchfield accidentally drove his car off a North Dakota highway on October 10, 2013. A state trooper arrived and watched as Birchfield unsuccessfully tried to drive back out of the ditch in which his car was stuck. The trooper approached, caught a strong whiff of alcohol, and saw that Birchfield's eyes were bloodshot and watery. Birchfield spoke in slurred speech and struggled to stay steady on his feet. At the trooper's request, Birchfield agreed to take several field sobriety tests and performed poorly on each. He had trouble reciting sections of the alphabet and counting backwards in compliance with the trooper's directions.

Believing that Birchfield was intoxicated, the trooper informed him of his obligation under state law to agree to a BAC test. Birchfield consented to a roadside breath test. The device used for this sort of test often differs from the machines used for breath tests administered in a police station and is intended to provide a preliminary assessment of the driver's BAC. See, *e.g.,* Berger 1403. Because the reliability of these preliminary or screening breath

_____

[2] See Smith, Moving From Grief to Action: Two Families Push for Stronger DUI Laws in N. D., Bismarck Tribune, Feb. 2, 2013, p. 1A; Haga, Some Kind of Peace: Parents of Two Young Boys Killed in Campground Accident Urge for Tougher DUI Penalties in N. D., Grand Forks Herald, Jan. 15, 2013, pp. A1–A2.

tests varies, many jurisdictions do not permit their numerical results to be admitted in a drunk-driving trial as evidence of a driver's BAC. See generally 3 Erwin §24.03[1]. In North Dakota, results from this type of test are "used only for determining whether or not a further test shall be given." N. D. Cent. Code Ann. §39–20–14(3). In Birchfield's case, the screening test estimated that his BAC was 0.254%, more than three times the legal limit of 0.08%. See §39–08–01(1)(a).

The state trooper arrested Birchfield for driving while impaired, gave the usual *Miranda* warnings, again advised him of his obligation under North Dakota law to undergo BAC testing, and informed him, as state law requires, see §39–20–01(3)(a), that refusing to take the test would expose him to criminal penalties. In addition to mandatory addiction treatment, sentences range from a mandatory fine of $500 (for first-time offenders) to fines of at least $2,000 and imprisonment of at least one year and one day (for serial offenders). §39–08–01(5). These criminal penalties apply to blood, breath, and urine test refusals alike. See §§39–08–01(2), 39–20–01, 39–20–14.

Although faced with the prospect of prosecution under this law, Birchfield refused to let his blood be drawn. Just three months before, Birchfield had received a citation for driving under the influence, and he ultimately pleaded guilty to that offense. *State* v. *Birchfield*, Crim. No. 30–2013–CR–00720 (Dist. Ct. Morton Cty., N. D., Jan. 27, 2014). This time he also pleaded guilty—to a misdemeanor violation of the refusal statute—but his plea was a conditional one: while Birchfield admitted refusing the blood test, he argued that the Fourth Amendment prohibited criminalizing his refusal to submit to the test. The State District Court rejected this argument and imposed a sentence that accounted for his prior conviction. Cf. §39–08–01(5)(b). The sentence included 30 days in jail (20 of which were suspended and 10 of which had already been

served), 1 year of unsupervised probation, $1,750 in fine and fees, and mandatory participation in a sobriety program and in a substance abuse evaluation. App. to Pet. for Cert. in No. 14–1468, p. 20a.

On appeal, the North Dakota Supreme Court affirmed. 2015 ND 6, 858 N. W. 2d 302. The court found support for the test refusal statute in this Court's *McNeely* plurality opinion, which had spoken favorably about "acceptable 'legal tools' with 'significant consequences' for refusing to submit to testing." 858 N. W. 2d, at 307 (quoting *McNeely*, 569 U. S., at ___ (slip op., at 18)).

### B

On August 5, 2012, Minnesota police received a report of a problem at a South St. Paul boat launch. Three apparently intoxicated men had gotten their truck stuck in the river while attempting to pull their boat out of the water. When police arrived, witnesses informed them that a man in underwear had been driving the truck. That man proved to be William Robert Bernard, Jr., petitioner in the second of these cases. Bernard admitted that he had been drinking but denied driving the truck (though he was holding its keys) and refused to perform any field sobriety tests. After noting that Bernard's breath smelled of alcohol and that his eyes were bloodshot and watery, officers arrested Bernard for driving while impaired.

Back at the police station, officers read Bernard Minnesota's implied consent advisory, which like North Dakota's informs motorists that it is a crime under state law to refuse to submit to a legally required BAC test. See Minn. Stat. §169A.51, subd. 2 (2014). Aside from noncriminal penalties like license revocation, §169A.52, subd. 3, test refusal in Minnesota can result in criminal penalties ranging from no more than 90 days' imprisonment and up to a $1,000 fine for a misdemeanor violation to seven years' imprisonment and a $14,000 fine for repeat offend-

ers, §169A.03, subd. 12; §169A.20, subds. 2–3; §169A.24, subd. 2; §169A.27, subd. 2.

The officers asked Bernard to take a breath test. After he refused, prosecutors charged him with test refusal in the first degree because he had four prior impaired-driving convictions. 859 N. W. 2d 762, 765, n. 1 (Minn. 2015) (case below). First-degree refusal carries the highest maximum penalties and a mandatory minimum 3-year prison sentence. §169A.276, subd. 1.

The Minnesota District Court dismissed the charges on the ground that the warrantless breath test demanded of Bernard was not permitted under the Fourth Amendment. App. to Pet. for Cert. in No. 14–1470, pp. 48a, 59a. The Minnesota Court of Appeals reversed, *id.,* at 46a, and the State Supreme Court affirmed that judgment. Based on the longstanding doctrine that authorizes warrantless searches incident to a lawful arrest, the high court concluded that police did not need a warrant to insist on a test of Bernard's breath. 859 N. W. 2d, at 766–772. Two justices dissented. *Id.,* at 774–780 (opinion of Page and Stras, JJ.).

### C

A police officer spotted our third petitioner, Steve Michael Beylund, driving the streets of Bowman, North Dakota, on the night of August 10, 2013. The officer saw Beylund try unsuccessfully to turn into a driveway. In the process, Beylund's car nearly hit a stop sign before coming to a stop still partly on the public road. The officer walked up to the car and saw that Beylund had an empty wine glass in the center console next to him. Noticing that Beylund also smelled of alcohol, the officer asked him to step out of the car. As Beylund did so, he struggled to keep his balance.

The officer arrested Beylund for driving while impaired and took him to a nearby hospital. There he read Beylund

North Dakota's implied consent advisory, informing him that test refusal in these circumstances is itself a crime. See N. D. Cent. Code Ann. §39–20–01(3)(a). Unlike the other two petitioners in these cases, Beylund agreed to have his blood drawn and analyzed. A nurse took a blood sample, which revealed a blood alcohol concentration of 0.250%, more than three times the legal limit.

Given the test results, Beylund's driver's license was suspended for two years after an administrative hearing. Beylund appealed the hearing officer's decision to a North Dakota District Court, principally arguing that his consent to the blood test was coerced by the officer's warning that refusing to consent would itself be a crime. The District Court rejected this argument, and Beylund again appealed.

The North Dakota Supreme Court affirmed. In response to Beylund's argument that his consent was insufficiently voluntary because of the announced criminal penalties for refusal, the court relied on the fact that its then-recent *Birchfield* decision had upheld the constitutionality of those penalties. 2015 ND 18, ¶¶14–15, 859 N. W. 2d 403, 408–409. The court also explained that it had found consent offered by a similarly situated motorist to be voluntary, *State* v. *Smith*, 2014 ND 152, 849 N. W. 2d 599. In that case, the court emphasized that North Dakota's implied consent advisory was not misleading because it truthfully related the penalties for refusal. *Id.,* at 606.

We granted certiorari in all three cases and consolidated them for argument, see 577 U. S. ___ (2015), in order to decide whether motorists lawfully arrested for drunk driving may be convicted of a crime or otherwise penalized for refusing to take a warrantless test measuring the alcohol in their bloodstream.

## III

As our summary of the facts and proceedings in these three cases reveals, the cases differ in some respects. Petitioners Birchfield and Beylund were told that they were obligated to submit to a blood test, whereas petitioner Bernard was informed that a breath test was required. Birchfield and Bernard each refused to undergo a test and was convicted of a crime for his refusal. Beylund complied with the demand for a blood sample, and his license was then suspended in an administrative proceeding based on test results that revealed a very high blood alcohol level.

Despite these differences, success for all three petitioners depends on the proposition that the criminal law ordinarily may not compel a motorist to submit to the taking of a blood sample or to a breath test unless a warrant authorizing such testing is issued by a magistrate. If, on the other hand, such warrantless searches comport with the Fourth Amendment, it follows that a State may criminalize the refusal to comply with a demand to submit to the required testing, just as a State may make it a crime for a person to obstruct the execution of a valid search warrant. See, *e.g.,* Conn. Gen. Stat. §54–33d (2009); Fla. Stat. §933.15 (2015); N. J. Stat. Ann. §33:1–63 (West 1994); 18 U. S. C. §1501; cf. *Bumper* v. *North Carolina*, 391 U. S. 543, 550 (1968) ("When a law enforcement officer claims authority to search a home under a warrant, he announces in effect that the occupant has no right to resist the search"). And by the same token, if such warrantless searches are constitutional, there is no obstacle under federal law to the admission of the results that they yield in either a criminal prosecution or a civil or administrative proceeding. We therefore begin by considering whether the searches demanded in these cases were consistent with the Fourth Amendment.

IV

The Fourth Amendment provides:

> "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

The Amendment thus prohibits "unreasonable searches," and our cases establish that the taking of a blood sample or the administration of a breath test is a search. See *Skinner* v. *Railway Labor Executives' Assn.*, 489 U. S. 602, 616–617 (1989); *Schmerber* v. *California*, 384 U. S. 757, 767–768 (1966). The question, then, is whether the warrantless searches at issue here were reasonable. See *Vernonia School Dist. 47J* v. *Acton*, 515 U. S. 646, 652 (1995) ("As the text of the Fourth Amendment indicates, the ultimate measure of the constitutionality of a governmental search is 'reasonableness'").

"[T]he text of the Fourth Amendment does not specify when a search warrant must be obtained." *Kentucky* v. *King*, 563 U. S. 452, 459 (2011); see also *California* v. *Acevedo*, 500 U. S. 565, 581 (1991) (Scalia, J., concurring in judgment) ("What [the text] explicitly states regarding warrants is by way of limitation upon their issuance rather than requirement of their use"). But "this Court has inferred that a warrant must [usually] be secured." *King*, 563 U. S., at 459. This usual requirement, however, is subject to a number of exceptions. *Ibid.*

We have previously had occasion to examine whether one such exception—for "exigent circumstances"—applies in drunk-driving investigations. The exigent circumstances exception allows a warrantless search when an emergency leaves police insufficient time to seek a warrant.

*Michigan* v. *Tyler*, 436 U. S. 499, 509 (1978). It permits, for instance, the warrantless entry of private property when there is a need to provide urgent aid to those inside, when police are in hot pursuit of a fleeing suspect, and when police fear the imminent destruction of evidence. *King*, *supra,* at 460.

In *Schmerber* v. *California*, we held that drunk driving *may* present such an exigency. There, an officer directed hospital personnel to take a blood sample from a driver who was receiving treatment for car crash injuries. 384 U. S., at 758. The Court concluded that the officer "might reasonably have believed that he was confronted with an emergency" that left no time to seek a warrant because "the percentage of alcohol in the blood begins to diminish shortly after drinking stops." *Id.,* at 770. On the specific facts of that case, where time had already been lost taking the driver to the hospital and investigating the accident, the Court found no Fourth Amendment violation even though the warrantless blood draw took place over the driver's objection. *Id.,* at 770–772.

More recently, though, we have held that the natural dissipation of alcohol from the bloodstream does not *always* constitute an exigency justifying the warrantless taking of a blood sample. That was the holding of *Missouri* v. *McNeely*, 569 U. S. \_\_\_, where the State of Missouri was seeking a *per se* rule that "whenever an officer has probable cause to believe an individual has been driving under the influence of alcohol, exigent circumstances will necessarily exist because BAC evidence is inherently evanescent." *Id.,* at \_\_\_ (opinion of the Court) (slip op., at 8). We disagreed, emphasizing that *Schmerber* had adopted a case-specific analysis depending on "all of the facts and circumstances of the particular case." 569 U. S., at \_\_\_ (slip op., at 8). We refused to "depart from careful case-by-case assessment of exigency and adopt the categorical rule proposed by the State." *Id.,* at \_\_\_ (slip

op., at 9).

While emphasizing that the exigent-circumstances exception must be applied on a case-by-case basis, the *McNeely* Court noted that other exceptions to the warrant requirement "apply categorically" rather than in a "case-specific" fashion. *Id.,* at ___, n. 3 (slip op., at 7, n. 3). One of these, as the *McNeely* opinion recognized, is the long-established rule that a warrantless search may be conducted incident to a lawful arrest. See *ibid.* But the Court pointedly did not address any potential justification for warrantless testing of drunk-driving suspects except for the exception "at issue in th[e] case," namely, the exception for exigent circumstances. *Id.,* at ___ (slip op., at 5). Neither did any of the Justices who wrote separately. See *id.,* at ___–___ (KENNEDY, J., concurring in part) (slip op., at 1–2); *id.,* at ___–___ (ROBERTS, C. J., concurring in part and dissenting in part) (slip op., at 1–11); *id.,* at ___–___ (THOMAS, J., dissenting) (slip op., at 1–8).

In the three cases now before us, the drivers were searched or told that they were required to submit to a search after being placed under arrest for drunk driving. We therefore consider how the search-incident-to-arrest doctrine applies to breath and blood tests incident to such arrests.

## V
## A

The search-incident-to-arrest doctrine has an ancient pedigree. Well before the Nation's founding, it was recognized that officers carrying out a lawful arrest had the authority to make a warrantless search of the arrestee's person. An 18th-century manual for justices of the peace provides a representative picture of usual practice shortly before the Fourth Amendment's adoption:

> "[A] thorough search of the felon is of the utmost consequence to your own safety, and the benefit of the

public, as by this means he will be deprived of in-
struments of mischief, and evidence may probably be
found on him sufficient to convict him, of which, if he
has either time or opportunity allowed him, he will
besure [sic] to find some means to get rid of." The
Conductor Generalis 117 (J. Parker ed. 1788) (reprint-
ing S. Welch, Observations on the Office of Constable
19 (1754)).

One Fourth Amendment historian has observed that,
prior to American independence, "[a]nyone arrested could
expect that not only his surface clothing but his body,
luggage, and saddlebags would be searched and, perhaps,
his shoes, socks, and mouth as well." W. Cuddihy, The
Fourth Amendment: Origins and Original Meaning: 602–
1791, p. 420 (2009).

No historical evidence suggests that the Fourth
Amendment altered the permissible bounds of arrestee
searches. On the contrary, legal scholars agree that "the
legitimacy of body searches as an adjunct to the arrest
process had been thoroughly established in colonial times,
so much so that their constitutionality in 1789 can not be
doubted." *Id.,* at 752; see also T. Taylor, Two Studies in
Constitutional Interpretation 28–29, 39, 45 (1969); Stuntz,
The Substantive Origins of Criminal Procedure, 105 Yale
L. J. 393, 401 (1995).

Few reported cases addressed the legality of such
searches before the 19th century, apparently because the
point was not much contested. In the 19th century, the
subject came up for discussion more often, but court deci-
sions and treatises alike confirmed the searches' broad
acceptance. *E.g., Holker* v. *Hennessey*, 141 Mo. 527, 539–
540, 42 S. W. 1090, 1093 (1897); *Ex parte Hurn*, 92 Ala.
102, 112, 9 So. 515, 519 (1891); *Thatcher* v. *Weeks*, 79 Me.
547, 548–549, 11 A. 599 (1887); *Reifsnyder* v. *Lee*, 44 Iowa
101, 103 (1876); F. Wharton, Criminal Pleading and Prac-

tice §60, p. 45 (8th ed. 1880); 1 J. Bishop, Criminal Proce-
dure §211, p. 127 (2d ed. 1872).

When this Court first addressed the question, we too
confirmed (albeit in dicta) "the right on the part of the
Government, always recognized under English and Ameri-
can law, to search the person of the accused when legally
arrested to discover and seize the fruits or evidence of
crime." *Weeks* v. *United States*, 232 U. S. 383, 392 (1914).
The exception quickly became a fixture in our Fourth
Amendment case law. But in the decades that followed,
we grappled repeatedly with the question of the authority
of arresting officers to search the area surrounding the
arrestee, and our decisions reached results that were not
easy to reconcile. See, *e.g., United States* v. *Lefkowitz*, 285
U. S. 452, 464 (1932) (forbidding "unrestrained" search of
room where arrest was made); *Harris* v. *United States*, 331
U. S. 145, 149, 152 (1947) (permitting complete search of
arrestee's four-room apartment); *United States* v. *Rab-
inowitz*, 339 U. S. 56, 60–65 (1950) (permitting complete
search of arrestee's office).

We attempted to clarify the law regarding searches
incident to arrest in *Chimel* v. *California*, 395 U. S. 752,
754 (1969), a case in which officers had searched the ar-
restee's entire three-bedroom house. *Chimel* endorsed a
general rule that arresting officers, in order to prevent the
arrestee from obtaining a weapon or destroying evidence,
could search both "the person arrested" and "the area
'within his immediate control.'" *Id.,* at 763. "[N]o compa-
rable justification," we said, supported "routinely search-
ing any room other than that in which an arrest occurs—
or, for that matter, for searching through all the desk
drawers or other closed or concealed areas in that room
itself." *Ibid.*

Four years later, in *United States* v. *Robinson*, 414 U. S.
218 (1973), we elaborated on *Chimel*'s meaning. We noted
that the search-incident-to-arrest rule actually comprises

"two distinct propositions": "The first is that a search may be made of the *person* of the arrestee by virtue of the lawful arrest. The second is that a search may be made of the area within the control of the arrestee." 414 U. S., at 224. After a thorough review of the relevant common law history, we repudiated "case-by-case adjudication" of the question whether an arresting officer had the authority to carry out a search of the arrestee's person. *Id.,* at 235. The permissibility of such searches, we held, does not depend on whether a search of a *particular* arrestee is likely to protect officer safety or evidence: "The authority to search the person incident to a lawful custodial arrest, while based upon the need to disarm and to discover evidence, does not depend on what a court may later decide was the probability in a particular arrest situation that weapons or evidence would in fact be found upon the person of the suspect." *Ibid.* Instead, the mere "fact of the lawful arrest" justifies "a full search of the person." *Ibid.* In *Robinson* itself, that meant that police had acted permissibly in searching inside a package of cigarettes found on the man they arrested. *Id.,* at 236.

Our decision two Terms ago in *Riley* v. *California,* 573 U. S. \_\_\_ (2014), reaffirmed "*Robinson*'s categorical rule" and explained how the rule should be applied in situations that could not have been envisioned when the Fourth Amendment was adopted. *Id.,* at \_\_\_ (slip op., at 9). *Riley* concerned a search of data contained in the memory of a modern cell phone. "Absent more precise guidance from the founding era," the Court wrote, "we generally determine whether to exempt a given type of search from the warrant requirement 'by assessing, on the one hand, the degree to which it intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests.'" *Ibid.*

Blood and breath tests to measure blood alcohol concentration are not as new as searches of cell phones, but here,

as in *Riley*, the founding era does not provide any defini-
tive guidance as to whether they should be allowed inci-
dent to arrest.[3]  Lacking such guidance, we engage in the
same mode of analysis as in *Riley*: we examine "the degree
to which [they] intrud[e] upon an individual's privacy and
. . . the degree to which [they are] needed for the promo-
tion of legitimate governmental interests.'"  *Ibid.*

### B

We begin by considering the impact of breath and blood
tests on individual privacy interests, and we will discuss
each type of test in turn.

### 1

Years ago we said that breath tests do not "implicat[e]
significant privacy concerns."  *Skinner*, 489 U. S., at 626.
That remains so today.

First, the physical intrusion is almost negligible.
Breath tests "do not require piercing the skin" and entail
"a minimum of inconvenience."  *Id.,* at 625.  As Minnesota
describes its version of the breath test, the process re-
quires the arrestee to blow continuously for 4 to 15 sec-
onds into a straw-like mouthpiece that is connected by a
tube to the test machine.  Brief for Respondent in No. 14–
1470, p. 20.  Independent sources describe other breath
test devices in essentially the same terms.  See *supra,* at 5.
The effort is no more demanding than blowing up a party
balloon.

Petitioner Bernard argues, however, that the process is
nevertheless a significant intrusion because the arrestee
must insert the mouthpiece of the machine into his or her

---

[3] At most, there may be evidence that an arrestee's mouth could be
searched in appropriate circumstances at the time of the founding.  See
W. Cuddihy, Fourth Amendment: Origins and Original Meaning: 602–
1791, p. 420 (2009).  Still, searching a mouth for weapons or contraband
is not the same as requiring an arrestee to give up breath or blood.

mouth. Reply Brief in No. 14–1470, p. 9. But there is nothing painful or strange about this requirement. The use of a straw to drink beverages is a common practice and one to which few object.

Nor, contrary to Bernard, is the test a significant intrusion because it "does not capture an ordinary exhalation of the kind that routinely is exposed to the public" but instead "'requires a sample of "alveolar" (deep lung) air.'" Brief for Petitioner in No. 14–1470, p. 24. Humans have never been known to assert a possessory interest in or any emotional attachment to *any* of the air in their lungs. The air that humans exhale is not part of their bodies. Exhalation is a natural process—indeed, one that is necessary for life. Humans cannot hold their breath for more than a few minutes, and all the air that is breathed into a breath analyzing machine, including deep lung air, sooner or later would be exhaled even without the test. See generally J. Hall, Guyton and Hall Textbook of Medical Physiology 519–520 (13th ed. 2016).

In prior cases, we have upheld warrantless searches involving physical intrusions that were at least as significant as that entailed in the administration of a breath test. Just recently we described the process of collecting a DNA sample by rubbing a swab on the inside of a person's cheek as a "negligible" intrusion. *Maryland* v. *King*, 569 U. S. \_\_\_, \_\_\_ (2013) (slip op., at 8). We have also upheld scraping underneath a suspect's fingernails to find evidence of a crime, calling that a "very limited intrusion." *Cupp* v. *Murphy*, 412 U. S. 291, 296 (1973). A breath test is no more intrusive than either of these procedures.

Second, breath tests are capable of revealing only one bit of information, the amount of alcohol in the subject's breath. In this respect, they contrast sharply with the sample of cells collected by the swab in *Maryland* v. *King*. Although the DNA obtained under the law at issue in that case could lawfully be used only for identification pur-

poses, 569 U. S., at ___ (slip op., at 5), the process put into the possession of law enforcement authorities a sample from which a wealth of additional, highly personal information could potentially be obtained. A breath test, by contrast, results in a BAC reading on a machine, nothing more. No sample of anything is left in the possession of the police.

Finally, participation in a breath test is not an experience that is likely to cause any great enhancement in the embarrassment that is inherent in any arrest. See *Skinner*, *supra*, at 625 (breath test involves "a minimum of . . . embarrassment"). The act of blowing into a straw is not inherently embarrassing, nor are evidentiary breath tests administered in a manner that causes embarrassment. Again, such tests are normally administered in private at a police station, in a patrol car, or in a mobile testing facility, out of public view. See *supra,* at 5. Moreover, once placed under arrest, the individual's expectation of privacy is necessarily diminished. *Maryland* v. *King*, *supra,* at ___–___ (slip op., at 24–25).

For all these reasons, we reiterate what we said in *Skinner*: A breath test does not "implicat[e] significant privacy concerns." 489 U. S., at 626.

### 2

Blood tests are a different matter. They "require piercing the skin" and extract a part of the subject's body. *Skinner*, *supra,* at 625; see also *McNeely*, 569 U. S., at ___ (opinion of the Court) (slip op., at 4) (blood draws are "a compelled physical intrusion beneath [the defendant's] skin and into his veins"); *id.,* at ___ (opinion of ROBERTS, C. J.) (slip op., at 9) (blood draws are "significant bodily intrusions"). And while humans exhale air from their lungs many times per minute, humans do not continually shed blood. It is true, of course, that people voluntarily submit to the taking of blood samples as part of a physical examination, and the process involves little pain or risk.

See *id.,* at \_\_\_ (plurality opinion) (slip op., at 16) (citing *Schmerber*, 384 U. S., at 771). Nevertheless, for many, the process is not one they relish. It is significantly more intrusive than blowing into a tube. Perhaps that is why many States' implied consent laws, including Minnesota's, specifically prescribe that breath tests be administered in the usual drunk-driving case instead of blood tests or give motorists a measure of choice over which test to take. See 1 Erwin §4.06; Minn. Stat. §169A.51, subd. 3.

In addition, a blood test, unlike a breath test, places in the hands of law enforcement authorities a sample that can be preserved and from which it is possible to extract information beyond a simple BAC reading. Even if the law enforcement agency is precluded from testing the blood for any purpose other than to measure BAC, the potential remains and may result in anxiety for the person tested.

C

Having assessed the impact of breath and blood testing on privacy interests, we now look to the States' asserted need to obtain BAC readings for persons arrested for drunk driving.

1

The States and the Federal Government have a "paramount interest . . . in preserving the safety of . . . public highways." *Mackey* v. *Montrym*, 443 U. S. 1, 17 (1979). Although the number of deaths and injuries caused by motor vehicle accidents has declined over the years, the statistics are still staggering. See, *e.g.,* NHTSA, Traffic Safety Facts 1995—Overview 2 (No. 95F7, 1995) (47,087 fatalities, 3,416,000 injuries in 1988); NHTSA, Traffic Safety Facts, 2014 Data, Summary of Motor Vehicle Crashes 1 (No. 812263, May 2016) (Table 1) (29,989 fatalities, 1,648,000 injuries in 2014).

Alcohol consumption is a leading cause of traffic fatalities and injuries. During the past decade, annual fatalities in drunk-driving accidents ranged from 13,582 deaths in 2005 to 9,865 deaths in 2011. NHTSA, 2014 Alcohol-Impaired Driving 2. The most recent data report a total of 9,967 such fatalities in 2014—on average, one death every 53 minutes. *Id.,* at 1. Our cases have long recognized the "carnage" and "slaughter" caused by drunk drivers. *Neville*, 459 U. S., at 558; *Breithaupt* v. *Abram*, 352 U. S. 432, 439 (1957).

JUSTICE SOTOMAYOR's partial dissent suggests that States' interests in fighting drunk driving are satisfied once suspected drunk drivers are arrested, since such arrests take intoxicated drivers off the roads where they might do harm. See *post,* at 9 (opinion concurring in part and dissenting in part). But of course States are not solely concerned with neutralizing the threat posed by a drunk driver who has already gotten behind the wheel. They also have a compelling interest in creating effective "deterrent[s] to drunken driving" so such individuals make responsible decisions and do not become a threat to others in the first place. *Mackey*, *supra,* at 18.

To deter potential drunk drivers and thereby reduce alcohol-related injuries, the States and the Federal Government have taken the series of steps that we recounted earlier. See *supra,* at 2–8. We briefly recapitulate. After pegging inebriation to a specific level of blood alcohol, States passed implied consent laws to induce motorists to submit to BAC testing. While these laws originally provided that refusal to submit could result in the loss of the privilege of driving and the use of evidence of refusal in a drunk-driving prosecution, more recently States and the Federal Government have concluded that these consequences are insufficient. In particular, license suspension alone is unlikely to persuade the most dangerous offenders, such as those who drive with a BAC significantly

above the current limit of 0.08% and recidivists, to agree to a test that would lead to severe criminal sanctions. NHTSA, Implied Consent Refusal Impact, pp. xvii, 83 (No. 807765, Sept. 1991); NHTSA, Use of Warrants for Breath Test Refusal 1 (No. 810852, Oct. 2007). The laws at issue in the present cases—which make it a crime to refuse to submit to a BAC test—are designed to provide an incentive to cooperate in such cases, and we conclude that they serve a very important function.

2

Petitioners and JUSTICE SOTOMAYOR contend that the States and the Federal Government could combat drunk driving in other ways that do not have the same impact on personal privacy. Their arguments are unconvincing.

The chief argument on this score is that an officer making an arrest for drunk driving should not be allowed to administer a BAC test unless the officer procures a search warrant or could not do so in time to obtain usable test results. The governmental interest in warrantless breath testing, JUSTICE SOTOMAYOR claims, turns on "'whether the burden of obtaining a warrant is likely to frustrate the governmental purpose behind the search.'" *Post,* at 3–4 (quoting *Camara* v. *Municipal Court of City and County of San Francisco*, 387 U. S. 523, 533 (1967)).

This argument contravenes our decisions holding that the legality of a search incident to arrest must be judged on the basis of categorical rules. In *Robinson*, for example, no one claimed that the object of the search, a package of cigarettes, presented any danger to the arresting officer or was at risk of being destroyed in the time that it would have taken to secure a search warrant. The Court nevertheless upheld the constitutionality of a warrantless search of the package, concluding that a categorical rule was needed to give police adequate guidance: "A police officer's determination as to how and where to search the

person of a suspect whom he has arrested is necessarily a quick *ad hoc* judgment which the Fourth Amendment does not require to be broken down in each instance into an analysis of each step in the search." 414 U. S., at 235; cf. *Riley*, 573 U. S., at ___ (slip op., at 22) ("If police are to have workable rules, the balancing of the competing interests must in large part be done on a categorical basis—not in an ad hoc, case-by-case fashion by individual police officers" (brackets, ellipsis, and internal quotation marks omitted)).

It is not surprising, then, that the language JUSTICE SOTOMAYOR quotes to justify her approach comes not from our search-incident-to-arrest case law, but a case that addressed routine home searches for possible housing code violations. See *Camara*, 387 U. S., at 526. *Camara*'s express concern in the passage that the dissent quotes was "whether the public interest demands *creation* of a general exception to the Fourth Amendment's warrant requirement." *Id.,* at 533 (emphasis added). *Camara* did *not* explain how to apply an existing exception, let alone the long-established exception for searches incident to a lawful arrest, whose applicability, as *Robinson* and *Riley* make plain, has never turned on case-specific variables such as how quickly the officer will be able to obtain a warrant in the particular circumstances he faces.

In advocating the case-by-case approach, petitioners and JUSTICE SOTOMAYOR cite language in our *McNeely* opinion. See Brief for Petitioner in No. 14–1468, p. 14; *post,* at 12. But *McNeely* concerned an exception to the warrant requirement—for exigent circumstances—that always requires case-by-case determinations. That was the basis for our decision in that case. 569 U. S., at ___ (slip op., at 9). Although JUSTICE SOTOMAYOR contends that the categorical search-incident-to-arrest doctrine and case-by-case exigent circumstances doctrine are actually parts of a single framework, *post,* at 6–7, and n. 3, in *McNeely* the

Court was careful to note that the decision did not address any other exceptions to the warrant requirement, 569 U. S., at ___, n. 3 (slip op., at 7, n. 3).

Petitioners and JUSTICE SOTOMAYOR next suggest that requiring a warrant for BAC testing in every case in which a motorist is arrested for drunk driving would not impose any great burden on the police or the courts. But of course the same argument could be made about searching through objects found on the arrestee's possession, which our cases permit even in the absence of a warrant. What about the cigarette package in *Robinson*? What if a motorist arrested for drunk driving has a flask in his pocket? What if a motorist arrested for driving while under the influence of marijuana has what appears to be a marijuana cigarette on his person? What about an unmarked bottle of pills?

If a search warrant were required for every search incident to arrest that does not involve exigent circumstances, the courts would be swamped. And even if we arbitrarily singled out BAC tests incident to arrest for this special treatment, as it appears the dissent would do, see *post,* at 12–14, the impact on the courts would be considerable. The number of arrests every year for driving under the influence is enormous—more than 1.1 million in 2014. FBI, Uniform Crime Report, Crime in the United States, 2014, Arrests 2 (Fall 2015). Particularly in sparsely populated areas, it would be no small task for courts to field a large new influx of warrant applications that could come on any day of the year and at any hour. In many jurisdictions, judicial officers have the authority to issue warrants only within their own districts, see, *e.g.,* Fed. Rule Crim. Proc. 41(b); N. D. Rule Crim. Proc. 41(a) (2016–2017), and in rural areas, some districts may have only a small number of judicial officers.

North Dakota, for instance, has only 51 state district

judges spread across eight judicial districts.[4]  Those judges are assisted by 31 magistrates, and there are no magistrates in 20 of the State's 53 counties.[5]  At any given location in the State, then, relatively few state officials have authority to issue search warrants.[6]  Yet the State, with a population of roughly 740,000, sees nearly 7,000 drunk-driving arrests each year.  Office of North Dakota Attorney General, Crime in North Dakota, 2014, pp. 5, 47 (2015).  With a small number of judicial officers authorized to issue warrants in some parts of the State, the burden of fielding BAC warrant applications 24 hours per day, 365 days of the year would not be the light burden that petitioners and JUSTICE SOTOMAYOR suggest.

In light of this burden and our prior search-incident-to-arrest precedents, petitioners would at a minimum have to show some special need for warrants for BAC testing.  It is therefore appropriate to consider the benefits that such applications would provide.  Search warrants protect privacy in two main ways.  First, they ensure that a search is not carried out unless a neutral magistrate makes an independent determination that there is probable cause to believe that evidence will be found.  See, *e.g., Riley*, 573 U. S., at ___ (slip op., at 5).  Second, if the magistrate finds probable cause, the warrant limits the intrusion on privacy by specifying the scope of the search—that is, the area that can be searched and the items that can be sought.  *United States* v. *Chadwick*, 433 U. S. 1, 9 (1977),

––––––––––

[4] See North Dakota Supreme Court, All District Judges, http://www.ndcourts.gov/court/districts/judges.htm (all Internet materials as last visited June 21, 2016).

[5] See North Dakota Supreme Court, Magistrates, http://www.ndcourts.gov/court/counties/magistra/members.htm.

[6] North Dakota Supreme Court justices apparently also have authority to issue warrants statewide.  See ND Op. Atty. Gen. 99–L–132, p. 2 (Dec. 30, 1999).  But we highly doubt that they regularly handle search-warrant applications, much less during graveyard shifts.

abrogated on other grounds, *Acevedo*, 500 U. S. 565.

How well would these functions be performed by the warrant applications that petitioners propose? In order to persuade a magistrate that there is probable cause for a search warrant, the officer would typically recite the same facts that led the officer to find that there was probable cause for arrest, namely, that there is probable cause to believe that a BAC test will reveal that the motorist's blood alcohol level is over the limit. As these three cases suggest, see Part II, *supra,* the facts that establish probable cause are largely the same from one drunk-driving stop to the next and consist largely of the officer's own characterization of his or her observations—for example, that there was a strong odor of alcohol, that the motorist wobbled when attempting to stand, that the motorist paused when reciting the alphabet or counting backwards, and so on. A magistrate would be in a poor position to challenge such characterizations.

As for the second function served by search warrants— delineating the scope of a search—the warrants in question here would not serve that function at all. In every case the scope of the warrant would simply be a BAC test of the arrestee. Cf. *Skinner*, 489 U. S., at 622 ("[I]n light of the standardized nature of the tests and the minimal discretion vested in those charged with administering the program, there are virtually no facts for a neutral magistrate to evaluate"). For these reasons, requiring the police to obtain a warrant in every case would impose a substantial burden but no commensurate benefit.

Petitioners advance other alternatives to warrantless BAC tests incident to arrest, but these are poor substitutes. Relying on a recent NHTSA report, petitioner Birchfield identifies 19 strategies that he claims would be at least as effective as implied consent laws, including high-visibility sobriety checkpoints, installing ignition interlocks on repeat offenders' cars that would disable

their operation when the driver's breath reveals a sufficiently high alcohol concentration, and alcohol treatment programs. Brief for Petitioner in No. 14–1468, at 44–45. But Birchfield ignores the fact that the cited report describes many of these measures, such as checkpoints, as significantly more costly than test refusal penalties. NHTSA, A. Goodwin et al., Countermeasures That Work: A Highway Safety Countermeasures Guide for State Highway Safety Offices, p. 1–7 (No. 811727, 7th ed. 2013). Others, such as ignition interlocks, target only a segment of the drunk-driver population. And still others, such as treatment programs, are already in widespread use, see *id.,* at 1–8, including in North Dakota and Minnesota. Moreover, the same NHTSA report, in line with the agency's guidance elsewhere, stresses that BAC test refusal penalties would be *more* effective if the consequences for refusal were made more severe, including through the addition of criminal penalties. *Id.,* at 1–16 to 1–17.

3

Petitioner Bernard objects to the whole idea of analyzing breath and blood tests as searches incident to arrest. That doctrine, he argues, does not protect the sort of governmental interests that warrantless breath and blood tests serve. On his reading, this Court's precedents permit a search of an arrestee solely to prevent the arrestee from obtaining a weapon or taking steps to destroy evidence. See Reply Brief in No. 14–1470, at 4–6. In *Chimel*, for example, the Court derived its limitation for the scope of the permitted search—"the area into which an arrestee might reach"—from the principle that officers may reasonably search "the area from within which he might gain possession of a weapon or destructible evidence." 395 U. S., at 763. Stopping an arrestee from destroying evidence, Bernard argues, is critically different from preventing the loss of blood alcohol evidence as the result of the

body's metabolism of alcohol, a natural process over which the arrestee has little control. Reply Brief in No. 14–1470, at 5–6.

The distinction that Bernard draws between an arrestee's active destruction of evidence and the loss of evidence due to a natural process makes little sense. In both situations the State is justifiably concerned that evidence may be lost, and Bernard does not explain why the cause of the loss should be dispositive. And in fact many of this Court's post-*Chimel* cases have recognized the State's concern, not just in avoiding an arrestee's intentional destruction of evidence, but in "evidence preservation" or avoiding "the loss of evidence" more generally. *Riley*, 573 U. S., at \_\_\_ (slip op., at 8); see also *Robinson*, 414 U. S., at 234 ("the need to preserve evidence on his person"); *Knowles* v. *Iowa*, 525 U. S. 113, 118–119 (1998) ("the need to discover and preserve evidence;" "the concern for destruction *or loss* of evidence" (emphasis added)); *Virginia* v. *Moore*, 553 U. S. 164, 176 (2008) (the need to "safeguard evidence"). This concern for preserving evidence or preventing its loss readily encompasses the inevitable metabolization of alcohol in the blood.

Nor is there any reason to suspect that *Chimel*'s use of the word "destruction," 395 U. S., at 763, was a deliberate decision to rule out evidence loss that is mostly beyond the arrestee's control. The case did not involve any evidence that was subject to dissipation through natural processes, and there is no sign in the opinion that such a situation was on the Court's mind.

Bernard attempts to derive more concrete support for his position from *Schmerber*. In that case, the Court stated that the "destruction of evidence under the direct control of the accused" is a danger that is not present "with respect to searches involving intrusions beyond the body's surface." 384 U. S., at 769. Bernard reads this to mean that an arrestee cannot be required "to take a chem-

ical test" incident to arrest, Brief for Petitioner in No. 14–1470, at 19, but by using the term "chemical test," Bernard obscures the fact that *Schmerber*'s passage was addressed to the type of test at issue in that case, namely a blood test. The Court described blood tests as "searches involving intrusions beyond the body's surface," and it saw these searches as implicating important "interests in human dignity and privacy," 384 U. S., at 769–770. Although the Court appreciated as well that blood tests "involv[e] virtually no risk, trauma, or pain," *id.,* at 771, its point was that such searches still impinge on far more sensitive interests than the typical search of the person of an arrestee. Cf. *supra,* at 22–23. But breath tests, unlike blood tests, "are *not* invasive of the body," *Skinner*, 489 U. S., at 626 (emphasis added), and therefore the Court's comments in *Schmerber* are inapposite when it comes to the type of test Bernard was asked to take. *Schmerber* did not involve a breath test, and on the question of breath tests' legality, *Schmerber* said nothing.

Finally, Bernard supports his distinction using a passage from the *McNeely* opinion, which distinguishes between "easily disposable evidence" over "which the suspect has control" and evidence, like blood alcohol evidence, that is lost through a natural process "in a gradual and relatively predictable manner." 569 U. S., at ___ (slip op., at 10); see Reply Brief in No. 14–1470, at 5–6. Bernard fails to note the issue that this paragraph addressed. *McNeely* concerned only one exception to the usual warrant requirement, the exception for exigent circumstances, and as previously discussed, that exception has always been understood to involve an evaluation of the particular facts of each case. Here, by contrast, we are concerned with the search-incident-to-arrest exception, and as we made clear in *Robinson* and repeated in *McNeely* itself, this authority is categorical. It does not depend on an evaluation of the threat to officer safety or the threat of evidence loss in a

particular case.[7]

Having assessed the effect of BAC tests on privacy interests and the need for such tests, we conclude that the Fourth Amendment permits warrantless breath tests incident to arrests for drunk driving. The impact of breath tests on privacy is slight, and the need for BAC testing is great.

We reach a different conclusion with respect to blood tests. Blood tests are significantly more intrusive, and their reasonableness must be judged in light of the availability of the less invasive alternative of a breath test. Respondents have offered no satisfactory justification for demanding the more intrusive alternative without a warrant.

Neither respondents nor their *amici* dispute the effec-

———————————

[7] JUSTICE SOTOMAYOR objects to treating warrantless breath tests as searches incident to a lawful arrest on two additional grounds.

First, she maintains that "[a]ll of this Court's postarrest exceptions to the warrant requirement require a law enforcement interest separate from criminal investigation." *Post,* at 14. At least with respect to the search-incident-to-arrest doctrine, that is not true. As the historical authorities discussed earlier attest, see Part V–A, *supra,* the doctrine has always been understood as serving investigative ends, such as "discover[ing] and seiz[ing] . . . evidences of crime." *Weeks* v. *United States,* 232 U. S. 383, 392 (1914); see also *United States* v. *Robinson,* 414 U. S. 218, 235 (1973) (emphasizing "the need . . . to discover evidence"). Using breath tests to obtain evidence of intoxication is therefore well within the historical understanding of the doctrine's purposes.

Second, JUSTICE SOTOMAYOR contends that the search-incident-to-arrest doctrine does not apply when "a narrower exception to the warrant requirement adequately satisfies the governmental needs asserted." *Post,* at 7, n. 3; see also *post,* at 17–19. But while this Court's cases have certainly recognized that "more targeted" exceptions to the warrant requirement may justify a warrantless search even when the search-incident-to-arrest exception would not, *Riley* v. *California,* 573 U. S. \_\_\_, \_\_\_ (2014) (slip op., at 14), JUSTICE SOTOMAYOR cites no authority for the proposition that an exception to the warrant requirement cannot apply simply because a "narrower" exception *might* apply.

tiveness of breath tests in measuring BAC. Breath tests have been in common use for many years. Their results are admissible in court and are widely credited by juries, and respondents do not dispute their accuracy or utility. What, then, is the justification for warrantless blood tests?

One advantage of blood tests is their ability to detect not just alcohol but also other substances that can impair a driver's ability to operate a car safely. See Brief for New Jersey et al. as *Amici Curiae* 9; Brief for United States as *Amicus Curiae* 6. A breath test cannot do this, but police have other measures at their disposal when they have reason to believe that a motorist may be under the influence of some other substance (for example, if a breath test indicates that a clearly impaired motorist has little if any alcohol in his blood). Nothing prevents the police from seeking a warrant for a blood test when there is sufficient time to do so in the particular circumstances or from relying on the exigent circumstances exception to the warrant requirement when there is not. See *McNeely*, 569 U. S., at ___–___ (slip op., at 22–23).

A blood test also requires less driver participation than a breath test. In order for a technician to take a blood sample, all that is needed is for the subject to remain still, either voluntarily or by being immobilized. Thus, it is possible to extract a blood sample from a subject who forcibly resists, but many States reasonably prefer not to take this step. See, *e.g., Neville*, 459 U. S., at 559–560. North Dakota, for example, tells us that it generally opposes this practice because of the risk of dangerous altercations between police officers and arrestees in rural areas where the arresting officer may not have backup. Brief for Respondent in No. 14–1468, p. 29. Under current North Dakota law, only in cases involving an accident that results in death or serious injury may blood be taken from arrestees who resist. Compare N. D. Cent. Code Ann. §§39–20–04(1), 39–20–01, with §39–20–01.1.

Opinion of the Court

It is true that a blood test, unlike a breath test, may be administered to a person who is unconscious (perhaps as a result of a crash) or who is unable to do what is needed to take a breath test due to profound intoxication or injuries. But we have no reason to believe that such situations are common in drunk-driving arrests, and when they arise, the police may apply for a warrant if need be.

A breath test may also be ineffective if an arrestee deliberately attempts to prevent an accurate reading by failing to blow into the tube for the requisite length of time or with the necessary force. But courts have held that such conduct qualifies as a refusal to undergo testing, *e.g., Andrews* v. *Turner*, 52 Ohio St. 2d 31, 36–37, 368 N. E. 2d 1253, 1256–1257 (1977); *In re Kunneman*, 501 P. 2d 910, 910–911 (Okla. Civ. App. 1972); see generally 1 Erwin §4.08[2] (collecting cases), and it may be prosecuted as such. And again, a warrant for a blood test may be sought.

Because breath tests are significantly less intrusive than blood tests and in most cases amply serve law enforcement interests, we conclude that a breath test, but not a blood test, may be administered as a search incident to a lawful arrest for drunk driving. As in all cases involving reasonable searches incident to arrest, a warrant is not needed in this situation.[8]

––––––––––

[8]JUSTICE THOMAS partly dissents from this holding, calling any distinction between breath and blood tests "an arbitrary line in the sand." *Post,* at 3 (opinion concurring in judgment in part and dissenting in part). Adhering to a position that the Court rejected in *McNeely*, JUSTICE THOMAS would hold that both breath and blood tests are constitutional with or without a warrant because of the natural metabolization of alcohol in the bloodstream. *Post,* at 3–5. Yet JUSTICE THOMAS does not dispute our conclusions that blood draws are more invasive than breath tests, that breath tests generally serve state interests in combating drunk driving as effectively as blood tests, and that our decision in *Riley* calls for a balancing of individual privacy interests and legitimate state interests to determine the reasonableness

## VI

Having concluded that the search incident to arrest doctrine does not justify the warrantless taking of a blood sample, we must address respondents' alternative argument that such tests are justified based on the driver's legally implied consent to submit to them. It is well established that a search is reasonable when the subject consents, *e.g., Schneckloth* v. *Bustamonte,* 412 U. S. 218, 219 (1973), and that sometimes consent to a search need not be express but may be fairly inferred from context, cf. *Florida* v. *Jardines*, 569 U. S. 1, ___–___ (2013) (slip op., at 6–7); *Marshall* v. *Barlow's, Inc.*, 436 U. S. 307, 313 (1978). Our prior opinions have referred approvingly to the general concept of implied-consent laws that impose civil penalties and evidentiary consequences on motorists who refuse to comply. See, *e.g., McNeely*, *supra*, at ___ (plurality opinion) (slip op., at 18); *Neville*, *supra*, at 560. Petitioners do not question the constitutionality of those laws, and nothing we say here should be read to cast doubt on them.

It is another matter, however, for a State not only to insist upon an intrusive blood test, but also to impose criminal penalties on the refusal to submit to such a test. There must be a limit to the consequences to which motorists may be deemed to have consented by virtue of a decision to drive on public roads.

Respondents and their *amici* all but concede this point. North Dakota emphasizes that its law makes refusal a misdemeanor and suggests that laws punishing refusal

―――――――――

of the category of warrantless search that is at issue.  Contrary to JUSTICE THOMAS's contention, this balancing does not leave law enforcement officers or lower courts with unpredictable rules, because it is categorical and *not* "case-by-case," *post,* at 3.  Indeed, today's decision provides very clear guidance that the Fourth Amendment allows warrantless breath tests, but as a general rule does not allow warrantless blood draws, incident to a lawful drunk-driving arrest.

more severely would present a different issue. Brief for Respondent in No. 14–1468, at 33–34. Borrowing from our Fifth Amendment jurisprudence, the United States suggests that motorists could be deemed to have consented to only those conditions that are "reasonable" in that they have a "nexus" to the privilege of driving and entail penalties that are proportional to severity of the violation. Brief for United States as *Amicus Curiae* 21–27. But in the Fourth Amendment setting, this standard does not differ in substance from the one that we apply, since reasonableness is always the touchstone of Fourth Amendment analysis, see *Brigham City* v. *Stuart*, 547 U. S. 398, 403 (2006). And applying this standard, we conclude that motorists cannot be deemed to have consented to submit to a blood test on pain of committing a criminal offense.

## VII

Our remaining task is to apply our legal conclusions to the three cases before us.

Petitioner Birchfield was criminally prosecuted for refusing a warrantless blood draw, and therefore the search he refused cannot be justified as a search incident to his arrest or on the basis of implied consent. There is no indication in the record or briefing that a breath test would have failed to satisfy the State's interests in acquiring evidence to enforce its drunk-driving laws against Birchfield. And North Dakota has not presented any case-specific information to suggest that the exigent circumstances exception would have justified a warrantless search. Cf. *McNeely*, 569 U. S., at \_\_\_–\_\_\_ (slip op., at 20–23). Unable to see any other basis on which to justify a warrantless test of Birchfield's blood, we conclude that Birchfield was threatened with an unlawful search and that the judgment affirming his conviction must be reversed.

Bernard, on the other hand, was criminally prosecuted

for refusing a warrantless breath test. That test *was* a permissible search incident to Bernard's arrest for drunk driving, an arrest whose legality Bernard has not contested. Accordingly, the Fourth Amendment did not require officers to obtain a warrant prior to demanding the test, and Bernard had no right to refuse it.

Unlike the other petitioners, Beylund was not prosecuted for refusing a test. He submitted to a blood test after police told him that the law required his submission, and his license was then suspended and he was fined in an administrative proceeding. The North Dakota Supreme Court held that Beylund's consent was voluntary on the erroneous assumption that the State could permissibly compel both blood and breath tests. Because voluntariness of consent to a search must be "determined from the totality of all the circumstances," *Schneckloth*, *supra*, at 227, we leave it to the state court on remand to reevaluate Beylund's consent given the partial inaccuracy of the officer's advisory.[9]

We accordingly reverse the judgment of the North Dakota Supreme Court in No. 14–1468 and remand the case for further proceedings not inconsistent with this opinion. We affirm the judgment of the Minnesota Supreme Court in No. 14–1470. And we vacate the judgment of the North Dakota Supreme Court in No. 14–1507 and remand the case for further proceedings not inconsistent with this opinion.

*It is so ordered.*

—————

[9] If the court on remand finds that Beylund did not voluntarily consent, it will have to address whether the evidence obtained in the search must be suppressed when the search was carried out pursuant to a state statute, see *Heien* v. *North Carolina*, 574 U. S. ___, ___–___ (2014) (slip op., at 8–10), and the evidence is offered in an administrative rather than criminal proceeding, see *Pennsylvania Bd. of Probation and Parole* v. *Scott*, 524 U. S. 357, 363–364 (1998). And as Beylund notes, remedies may be available to him under state law. See Brief for Petitioner in No. 14–1507, pp. 13–14.

# SUPREME COURT OF THE UNITED STATES

————

Nos. 14–1468, 14–1470, and 14–1507

————

DANNY BIRCHFIELD, PETITIONER
14–1468　　　　　　　　*v.*
NORTH DAKOTA;

ON WRIT OF CERTIORARI TO THE SUPREME COURT OF
NORTH DAKOTA

WILLIAM ROBERT BERNARD, JR., PETITIONER
14–1470　　　　　　　　*v.*
MINNESOTA; AND

ON WRIT OF CERTIORARI TO THE SUPREME COURT OF
MINNESOTA

STEVE MICHAEL BEYLUND, PETITIONER
14–1507　　　　　　　　*v.*
GRANT LEVI, DIRECTOR, NORTH DAKOTA
DEPARTMENT OF TRANSPORTATION

ON WRIT OF CERTIORARI TO THE SUPREME COURT OF
NORTH DAKOTA

[June 23, 2016]

JUSTICE SOTOMAYOR, with whom JUSTICE GINSBURG joins, concurring in part and dissenting in part.

The Court today considers three consolidated cases. I join the majority's disposition of *Birchfield* v. *North Dakota*, No. 14–1468, and *Beylund* v. *Levi*, No. 14–1507, in which the Court holds that the search-incident-to-arrest exception to the Fourth Amendment's warrant requirement does not permit warrantless blood tests. But I dis-

sent from the Court's disposition of *Bernard* v. *Minnesota*, No. 14–1470, in which the Court holds that the same exception permits warrantless breath tests. Because no governmental interest categorically makes it impractical for an officer to obtain a warrant before measuring a driver's alcohol level, the Fourth Amendment prohibits such searches without a warrant, unless exigent circumstances exist in a particular case.[1]

I

A

As the Court recognizes, the proper disposition of this case turns on whether the Fourth Amendment guarantees a right not to be subjected to a warrantless breath test after being arrested. The Fourth Amendment provides:

> "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

The "ultimate touchstone of the Fourth Amendment is 'reasonableness.'" *Brigham City* v. *Stuart*, 547 U. S. 398, 403 (2006). A citizen's Fourth Amendment right to be free from "unreasonable searches" does not disappear upon arrest. Police officers may want to conduct a range of searches after placing a person under arrest. They may want to pat the arrestee down, search her pockets and purse, peek inside her wallet, scroll through her cellphone, examine her car or dwelling, swab her cheeks, or take

---

[1] Because I see no justification for warrantless blood or warrantless breath tests, I also dissent from the parts of the majority opinion that justify its conclusions with respect to blood tests on the availability of warrantless breath tests. See *ante*, at 33-34.

blood and breath samples to determine her level of intoxication. But an officer is not authorized to conduct all of these searches simply because he has arrested someone. Each search must be separately analyzed to determine its reasonableness.

Both before and after a person has been arrested, warrants are the usual safeguard against unreasonable searches because they guarantee that the search is not a "random or arbitrary ac[t] of government agents," but is instead "narrowly limited in its objectives and scope." *Skinner* v. *Railway Labor Executives' Assn.*, 489 U. S. 602, 622 (1989). Warrants provide the "detached scrutiny of a neutral magistrate, and thus ensur[e] an objective determination whether an intrusion is justified." *Ibid.* And they give life to our instruction that the Fourth Amendment "is designed to prevent, not simply to redress, unlawful police action." *Steagald* v. *United States*, 451 U. S. 204, 215 (1981) (internal quotation marks omitted).

Because securing a warrant before a search is the rule of reasonableness, the warrant requirement is "subject only to a few specifically established and well-delineated exceptions." *Katz* v. *United States*, 389 U. S. 347, 357 (1967). To determine whether to "exempt a given type of search from the warrant requirement," this Court traditionally "assess[es], on the one hand, the degree to which it intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests." *Riley* v. *California*, 573 U. S. \_\_\_, \_\_\_ (2014) (slip op., at 9) (internal quotation marks omitted). In weighing "whether the public interest demands creation of a general exception to the Fourth Amendment's warrant requirement, the question is not whether the public interest justifies the type of search in question," but, more specifically, "whether the burden of obtaining a warrant is likely to frustrate the governmental purpose behind the search." *Camara* v. *Municipal Court*

*of City and County of San Francisco*, 387 U. S. 523, 533 (1967); see also *Almeida-Sanchez* v. *United States,* 413 U. S. 266, 282–283 (1973) (Powell, J., concurring) (noting that in areas ranging from building inspections to automobile searches, the Court's "general approach to exceptions to the warrant requirement" is to determine whether a "'warrant system can be constructed that would be feasible and meaningful'"); *United States* v. *United States Dist. Court for Eastern Dist. of Mich.*, 407 U. S. 297, 315 (1972) ("We must . . . ask whether a warrant requirement would unduly frustrate the [governmental interest]").[2]

Applying these principles in past cases, this Court has recognized two kinds of exceptions to the warrant requirement that are implicated here: (1) case-by-case exceptions, where the particularities of an individual case justify a warrantless search in that instance, but not others; and (2) categorical exceptions, where the commonalities among a class of cases justify dispensing with the warrant requirement for all of those cases, regardless of their individual circumstances.

Relevant here, the Court allows warrantless searches on a case-by-case basis where the "exigencies" of the particular case "make the needs of law enforcement so compelling that a warrantless search is objectively reasonable" in that

---

[2] The Court is wrong to suggest that because the States are seeking an extension of the "existing" search-incident-to-arrest exception rather than the "creation" of a new exception for breath searches, this Court need not determine whether the governmental interest in these searches can be accomplished without excusing the warrant requirement. *Ante*, at 26. To the contrary, as the very sentence the Court cites illustrates, the question is always whether the particular "type of search in question" is reasonable if conducted without a warrant. *Camara*, 387 U. S., at 533. To answer that question, in every case, courts must ask whether the "burden of obtaining a warrant is likely to frustrate the governmental purpose behind the search." *Ibid.* This question may be answered based on existing doctrine, or it may require the creation of new doctrine, but it must always be asked.

instance. *Missouri* v. *McNeely*, 569 U. S. \_\_\_, \_\_\_ (2013) (slip op., at 5) (quoting *Kentucky* v. *King*, 563 U. S. 452, 460 (2011)). The defining feature of the exigent circumstances exception is that the need for the search becomes clear only after "all of the facts and circumstances of the particular case" have been considered in light of the "totality of the circumstances." 569 U. S., at \_\_\_ (slip op., at 8). Exigencies can include officers' "need to provide emergency assistance to an occupant of a home, engage in 'hot pursuit' of a fleeing suspect, or enter a burning building to put out a fire and investigate its cause." *Id.,* at \_\_\_ (slip op., at 5) (citations omitted).

Exigencies can also arise in efforts to measure a driver's blood alcohol level. In *Schmerber* v. *California*, 384 U. S. 757 (1966), for instance, a man sustained injuries in a car accident and was transported to the hospital. While there, a police officer arrested him for drunk driving and ordered a warrantless blood test to measure his blood alcohol content. This Court noted that although the warrant requirement generally applies to postarrest blood tests, a warrantless search was justified in that case because several hours had passed while the police investigated the scene of the crime and Schmerber was taken to the hospital, precluding a timely securing of a warrant. *Id.*, at 770–771.

This Court also recognizes some forms of searches in which the governmental interest will "categorically" outweigh the person's privacy interest in virtually any circumstance in which the search is conducted. Relevant here is the search-incident-to-arrest exception. That exception allows officers to conduct a limited postarrest search without a warrant to combat risks that could arise in any arrest situation before a warrant could be obtained: "'to remove any weapons that the [arrestee] might seek to use in order to resist arrest or effect his escape'" and to "'seize any evidence on the arrestee's person in order to

prevent its concealment or destruction.'" *Riley*, 573 U. S.,
at ___ (slip op., at 6) (quoting *Chimel* v. *California*, 395
U. S. 752, 763 (1969)). That rule applies "categorical[ly]"
to all arrests because the need for the warrantless search
arises from the very "fact of the lawful arrest," not from
the reason for arrest or the circumstances surrounding it.
*United States* v. *Robinson*, 414 U. S. 218, 225, 235 (1973).

Given these different kinds of exceptions to the warrant
requirement, if some form of exception is necessary for a
particular kind of postarrest search, the next step is to ask
whether the governmental need to conduct a warrantless
search arises from "threats" that "'lurk in all custodial
arrests'" and therefore "justif[ies] dispensing with the
warrant requirement across the board," or, instead,
whether the threats "may be implicated in a particular
way in a particular case" and are therefore "better ad-
dressed through consideration of case-specific exceptions
to the warrant requirement, such as the one for exigent
circumstances." *Riley*, 573 U. S., at ___ (slip op., at 11–12)
(alterations and internal quotation marks omitted).

To condense these doctrinal considerations into a
straightforward rule, the question is whether, in light of
the individual's privacy, a "legitimate governmental inter-
est" justifies warrantless searches—and, if so, whether
that governmental interest is adequately addressed by a
case-by-case exception or requires by its nature a categori-
cal exception to the warrant requirement.

### B

This Court has twice applied this framework in recent
terms. *Riley* v. *California*, 573 U. S. ___, addressed whether,
after placing a person under arrest, a police officer may
conduct a warrantless search of his cell phone data. Cali-
fornia asked for a categorical rule, but the Court rejected
that request, concluding that cell phones do not present
the generic arrest-related harms that have long justified

the search-incident-to-arrest exception. The Court found that phone data posed neither a danger to officer safety nor a risk of evidence destruction once the physical phone was secured. *Id.,* at ___–___ (slip op., at 10–15). The Court nevertheless acknowledged that the exigent circumstances exception might be available in a "now or never situation." *Id.,* at ___ (slip op., at 15) (internal quotation marks omitted). It emphasized that "[i]n light of the availability of the exigent circumstances exception, there is no reason to believe that law enforcement officers will not be able to address" the rare needs that would require an on-the-spot search. *Id.,* at ___ (slip op., at 26).

Similarly, *Missouri* v. *McNeely*, 569 U. S. ___, applied this doctrinal analysis to a case involving police efforts to measure drivers' blood alcohol levels. In that case, Missouri argued that the natural dissipation of alcohol in a person's blood justified a *per se* exigent circumstances exception to the warrant requirement—in essence, a new kind of categorical exception. The Court recognized that exigencies could exist, like in *Schmerber*, that would justify warrantless searches. 569 U. S., at ___ (slip op., at 9). But it also noted that in many drunk driving situations, no such exigencies exist. Where, for instance, "the warrant process will not significantly increase the delay" in testing "because an officer can take steps to secure a warrant" while the subject is being prepared for the test, there is "no plausible justification for an exception to the warrant requirement." *Id.,* at ___ (slip op., at 10). The Court thus found it unnecessary to "depart from careful case-by-case assessment of exigency and adopt the categorical rule proposed by the State." *Id.,* at ___ (slip op., at 9).[3]

—————

[3] The Court quibbles with our unremarkable statement that the categorical search-incident-to-arrest doctrine and the case-by-case exigent circumstances doctrine are part of the same framework by arguing that a footnote in *McNeely* was "careful to note that the decision did not address any other exceptions to the warrant requirement." *Ante*, at 26-

## II

The States do not challenge *McNeely*'s holding that a categorical exigency exception is not necessary to accommodate the governmental interests associated with the dissipation of blood alcohol after drunk-driving arrests. They instead seek to exempt breath tests from the warrant requirement categorically under the search-incident-to-arrest doctrine. The majority agrees. Both are wrong.

As discussed above, regardless of the exception a State requests, the Court's traditional framework asks whether, in light of the privacy interest at stake, a legitimate gov-

_____

27 (citing *McNeely*, 569 U. S., at ___, n. 3 (slip op., at 7, n. 3)). That footnote explains the difference between categorical exceptions and case-by-case exceptions generally. *Id.,* at ___, n. 3. It does nothing to suggest that the two forms of exceptions should not be considered together when analyzing whether it is reasonable to exempt categorically a particular form of search from the Fourth Amendment's warrant requirement.

It should go without saying that any analysis of whether to apply a Fourth Amendment warrant exception must necessarily be comparative. If a narrower exception to the warrant requirement adequately satisfies the governmental needs asserted, a more sweeping exception will be overbroad and could lead to unnecessary and "unreasonable searches" under the Fourth Amendment. Contrary to the Court's suggestion that "no authority" supports this proposition, see *ante*, at 33 n. 8, our cases have often deployed this commonsense comparative check. See *Riley* v. *California*, 573 U. S. ___, ___–___ (2014) (slip op., at 14–15) (rejecting the application of the search-incident-to-arrest exception because the exigency exception is a "more targeted wa[y] to address [the government's] concerns"); *id.,* at ___ (slip op., at 11) (analyzing whether the governmental interest can be "better addressed through consideration of case-specific exceptions to the warrant requirement"); *id.*, at __ (slip op., at 26–27) (noting that "[i]n light of the availability of the exigent circumstances exception, there is no reason to believe that" the governmental interest cannot be satisfied without a categorical search-incident-to-arrest exception); *McNeely*, 569 U. S., at ___ (slip op., at 9–10) (holding that the availability of the exigency exception for circumstances that "make obtaining a warrant impractical" is "reason . . . not to accept the 'considerable overgeneralization' that a per se rule would reflect").

ernmental interest ever requires conducting breath searches without a warrant—and, if so, whether that governmental interest is adequately addressed by a case-by-case exception or requires a categorical exception to the warrant requirement. That framework directs the conclusion that a categorical search-incident-to-arrest rule for breath tests is unnecessary to address the States' governmental interests in combating drunk driving.

## A

Beginning with the governmental interests, there can be no dispute that States must have tools to combat drunk driving. See *ante,* at 2–8. But neither the States nor the Court has demonstrated that "obtaining a warrant" in cases not already covered by the exigent circumstances exception "is likely to frustrate the governmental purpose[s] behind [this] search." *Camara,* 387 U. S., at 533.[4]

First, the Court cites the governmental interest in protecting the public from drunk drivers. See *ante,* at 24. But it is critical to note that once a person is stopped for drunk driving and arrested, he no longer poses an immediate threat to the public. Because the person is already in custody prior to the administration of the breath test, there can be no serious claim that the time it takes to obtain a warrant would increase the danger that drunk driver poses to fellow citizens.

Second, the Court cites the governmental interest in preventing the destruction or loss of evidence. See *ante,* at 30-31. But neither the Court nor the States identify any practical reasons why obtaining a warrant after making an arrest and before conducting a breath test compromises the quality of the evidence obtained. To the contrary, the delays inherent in administering reliable breath tests

––––––––

[4] Although Bernard's case arises in Minnesota, North Dakota's similar breath test laws are before this Court. I therefore consider both States together.

generally provide ample time to obtain a warrant.

There is a common misconception that breath tests are conducted roadside, immediately after a driver is arrested. While some preliminary testing is conducted roadside, reliability concerns with roadside tests confine their use in most circumstances to establishing probable cause for an arrest. See 2 R. Erwin, Defense of Drunk Driving Cases §18.08 (3d ed. 2015) ("Screening devices are . . . used when it is impractical to utilize an evidential breath tester (EBT) (e.g. at roadside or at various work sites)"). The standard evidentiary breath test is conducted after a motorist is arrested and transported to a police station, governmental building, or mobile testing facility where officers can access reliable, evidence-grade breath testing machinery. Brief for Respondent in No. 14–1618, p. 8, n. 2; National Highway Transportation Safety Admin. (NHTSA), A. Berning et al., Refusal of Intoxication Testing: A Report to Congress 4, and n. 5 (No. 811098, Sept. 2008). Transporting the motorist to the equipment site is not the only potential delay in the process, however. Officers must also observe the subject for 15 to 20 minutes to ensure that "residual mouth alcohol," which can inflate results and expose the test to an evidentiary challenge at trial, has dissipated and that the subject has not inserted any food or drink into his mouth.[5] In many States, including Minnesota, officers must then give the motorist a window of time within which to contact an attorney before administering a test.[6] Finally, if a breath test machine is

---

[5] See NHTSA and International Assn. of Chiefs of Police, DWI Detection and Standardized Field Sobriety Testing Participant Guide, Session 7, p. 20 (2013).

[6] See Minn. Stat. §169A.51, subd. 2(4) (2014) ("[T]he person has the right to consult with an attorney, but . . . this right is limited to the extent that it cannot unreasonably delay administration of the test"); see also *Kuhn* v. *Commissioner of Public Safety*, 488 N. W. 2d 838 (Minn. App. 1992) (finding 24 minutes insufficient time to contact an

not already active, the police officer must set it up. North Dakota's Intoxilyzer 8000 machine can take as long as 30 minutes to "warm-up."[7]

Because of these necessary steps, the standard breath test is conducted well after an arrest is effectuated. The Minnesota Court of Appeals has explained that nearly all breath tests "involve a time lag of 45 minutes to two hours." *State* v. *Larson*, 429 N. W. 2d 674, 676 (Minn. App. 1988); see also *State* v. *Chirpich*, 392 N. W. 2d 34, 37 (Minn. App. 1986). Both North Dakota and Minnesota give police a 2-hour period from the time the motorist was pulled over within which to administer a breath test. N. D. Cent. Code Ann. §39–20–04.1(1) (2008); Minn. Stat. §169A.20, subd. 1(5) (2014).[8]

During this built-in window, police can seek warrants. That is particularly true in light of "advances" in technology that now permit "the more expeditious processing of warrant applications." *McNeely*, 569 U. S., at ___–___, and n. 4 (slip op., at 11–12, and n. 4) (describing increased availability of telephonic warrants); *Riley*, 573 U. S., at ___ (slip op., at 26) (describing jurisdictions that have adopted an e-mail warrant system that takes less than 15 minutes); Minn. Rules Crim. Proc. 33.05, 36.01–36.08 (2010 and Supp. 2013) (allowing telephonic warrants); N. D. Rules Crim. Proc. 41(c)(2)–(3) (2013) (same). Moreover, counsel for North Dakota explained at oral argument that

––––––––

attorney before being required to submit to a test).

[7] See Office of Attorney General, Crime Lab. Div., Chemical Test Training Student Manual, Fall 2011–Spring 2012, p. 13 (2011).

[8] Many tests are conducted at the outer boundaries of that window. See, *e.g., Israel* v. *Commissioner of Public Safety*, 400 N. W. 2d 428 (Minn. App. 1987) (57 minute poststop delay); *Mosher* v. *Commissioner of Public Safety*, 2015 WL 3649344 (Minn. App., June 15, 2015) (119 minute postarrest delay); *Johnson* v. *Commissioner of Public Safety*, 400 N. W. 2d 195 (Minn. App. 1987) (96 minute postarrest delay); *Scheiterlein* v. *Commissioner of Public Safety*, 2014 WL 3021278 (Minn. App., July 7, 2014) (111 minute poststop delay).

the State uses a typical "on-call" system in which some judges are available even during off-duty times.[9]  See Tr. of Oral Arg. 42.

Where "an officer can . . . secure a warrant while" the motorist is being transported and the test is being prepared, this Court has said that "there would be no plausible justification for an exception to the warrant requirement." *McNeely*, 569 U. S., at ___ (slip op., at 10).  Neither the Court nor the States provide any evidence to suggest that, in the normal course of affairs, obtaining a warrant and conducting a breath test will exceed the allotted 2-hour window.

Third, the Court and the States cite a governmental interest in minimizing the costs of gathering evidence of drunk driving.  But neither has demonstrated that requiring police to obtain warrants for breath tests would impose a sufficiently significant burden on state resources to justify the elimination of the Fourth Amendment's warrant requirement.  The Court notes that North Dakota has 82 judges and magistrate judges who are authorized to issue warrants.  See *ante*, at 27-28.  Because North Dakota has roughly 7,000 drunk-driving arrests annually, the Court concludes that if police were required to obtain warrants "for every search incident to arrest that does not involve exigent circumstances, the courts would be swamped." *Ante,* at 27.  That conclusion relies on inflated numbers and unsupported inferences.

Assuming that North Dakota police officers do not ob-

_____

[9] Counsel for North Dakota represented at oral argument that in "larger jurisdictions" it "takes about a half an hour" to obtain a warrant.  Tr. of Oral Arg. 42.  Counsel said that it is sometimes "harder to get somebody on the phone" in rural jurisdictions, but even if it took twice as long, the process of obtaining a warrant would be unlikely to take longer than the inherent delays in preparing a motorist for testing and would be particularly unlikely to reach beyond the 2-hour window within which officers can conduct the test.

tain warrants for any drunk-driving arrests today, and assuming that they would need to obtain a warrant for every drunk-driving arrest tomorrow, each of the State's 82 judges and magistrate judges would need to issue fewer than two extra warrants per week.[10]  Minnesota has nearly the same ratio of judges to drunk-driving arrests, and so would face roughly the same burden.[11]  These back-of-the-envelope numbers suggest that the burden of obtaining a warrant before conducting a breath test would be small in both States.

But even these numbers *overstate* the burden by a significant degree.  States only need to obtain warrants for drivers who refuse testing and a significant majority of drivers voluntarily consent to breath tests, even in States without criminal penalties for refusal.  In North Dakota, only 21% of people refuse breath tests and in Minnesota, only 12% refuse.  NHTSA, E. Namuswe, H. Coleman, & A. Berning, Breath Test Refusal Rates in the United States– 2011 Update 2 (No. 811881 2014).  Including States that impose only *civil* penalties for refusal, the average refusal rate is slightly higher at 24%.  *Id.,* at 3.  Say that North Dakota's and Minnesota's refusal rates rise to double the mean, or 48%.  Each of their judges and magistrate judges would need to issue fewer than one extra warrant a

——————

[10] Seven thousand annual arrests divided by 82 judges and magistrate judges is 85.4 extra warrants per judge and magistrate judge per year.  And 85.4 divided by 52 weeks is 1.64 extra warrants per judge and magistrate judge per week.

[11] Minnesota has about 25,000 drunk-driving incidents each year. Minn. Dept. of Public Safety, Office of Traffic Safety, Minn. Impaired Driving Facts 2014, p. 2 (2015).  In Minnesota, all judges not exercising probate jurisdiction can issue warrants.  Minn. Stat. §626.06 (2009). But the state district court judges appear to do the lion's share of that work.  So, conservatively counting only those judges, the State has 280 judges that can issue warrants.  Minnesota Judicial Branch, Report to the Community 23 (2015).  Similar to North Dakota, that amounts to 1.72 extra warrants per judge per week.

week.[12]  That bears repeating: The Court finds a categorical exception to the warrant requirement because each of a State's judges and magistrate judges would need to issue less than one extra warrant a week.

Fourth, the Court alludes to the need to collect evidence conveniently.  But mere convenience in investigating drunk driving cannot itself justify an exception to the warrant requirement.  All of this Court's postarrest exceptions to the warrant requirement require a law enforcement interest separate from criminal investigation.  The Court's justification for the search incident to arrest rule is "the officer's safety" and the prevention of evidence "concealment or destruction."  *Chimel*, 395 U. S., at 763. The Court's justification for the booking exception, which allows police to obtain fingerprints and DNA without a warrant while booking an arrestee at the police station, is the administrative need for identification.  See *Maryland* v. *King*, 569 U. S. ___, ___–___ (2013) (slip op., at 11–12). The Court's justification for the inventory search exception, which allows police to inventory the items in the arrestee's personal possession and car, is the need to "protect an owner's property while it is in the custody of the police, to insure against claims of lost, stolen, or vandalized property, and to guard the police from danger." *Colorado* v. *Bertine*, 479 U. S. 367, 372 (1987).

This Court has never said that mere convenience in gathering evidence justifies an exception to the warrant requirement.  See *Florida* v. *Wells*, 495 U. S. 1, 4 (1990) (suppressing evidence where supposed "inventory" search

---

[12] Because each of North Dakota's judges and magistrate judges would have to issue an extra 1.64 warrants per week assuming a 100% refusal rate, see *supra*, at 13, nn. 10–11, they would have to issue an additional 0.79 per week assuming a 48% refusal rate.  Adjusting for the same conservatively high refusal rate, Minnesota would go from 1.72 additional warrants per judge per week to just 0.82.

was done without standardized criteria, suggesting instead "'a purposeful and general means of discovering evidence of crime'"). If the simple collection of evidence justifies an exception to the warrant requirement even where a warrant could be easily obtained, exceptions would become the rule. *Ibid.*

Finally, as a general matter, the States have ample tools to force compliance with lawfully obtained warrants. This Court has never cast doubt on the States' ability to impose criminal penalties for obstructing a search authorized by a lawfully obtained warrant. No resort to violent compliance would be necessary to compel a test. If a police officer obtains a warrant to conduct a breath test, citizens can be subjected to serious penalties for obstruction of justice if they decline to cooperate with the test.

This Court has already taken the weighty step of characterizing breath tests as "searches" for Fourth Amendment purposes. See *Skinner*, 489 U. S., at 616–617. That is because the typical breath test requires the subject to actively blow alveolar (or "deep lung") air into the machine. *Ibid.* Although the process of physically blowing into the machine can be completed in as little as a few minutes, the end-to-end process can be significantly longer. The person administering the test must calibrate the machine, collect at least two separate samples from the arrestee, change the mouthpiece and reset the machine between each, and conduct any additional testing indicated by disparities between the two tests.[13] Although some searches are certainly more invasive than breath tests, this Court cannot do justice to their status as Fourth Amendment "searches" if exaggerated time pressures, mere convenience in collecting evidence, and the "burden"

---

[13] See Office of Attorney General, Crime Lab. Div., Approved Method To Conduct Breath Tests With the Intoxilyzer 8000 (BRS–001), pp. 4–6, 8 (2012).

of asking judges to issue an extra couple of warrants per month are costs so high as to render reasonable a search without a warrant.[14]  The Fourth Amendment becomes an empty promise of protecting citizens from unreasonable searches.

## B

After evaluating the governmental and privacy interests at stake here, the final step is to determine whether any situations in which warrants would interfere with the States' legitimate governmental interests should be accommodated through a case-by-case or categorical exception to the warrant requirement.

As shown, because there are so many circumstances in which obtaining a warrant will not delay the administration of a breath test or otherwise compromise any governmental interest cited by the States, it should be clear that allowing a categorical exception to the warrant requirement is a "considerable overgeneralization" here. *McNeely*, 569 U. S., at ___ (slip op., at 10). As this Court concluded in *Riley* and *McNeely*, any unusual issues that

--------

[14] In weighing the governmental interests at stake here, the Court also downplays the "benefits" that warrants provide for breath tests. Because this Court has said unequivocally that warrants are the usual safeguard against unreasonable searches, see *Katz* v. *United States,* 389 U. S. 347, 357 (1967), the legal relevance of this discussion is not clear.  In any event, the Court is wrong to conclude that warrants provide little benefit here.  The Court says that any warrants for breath tests would be issued based on the "characterization" of the police officer, which a "magistrate would be in a poor position to challenge." *Ante*, at 29.  Virtually all warrants will rely to some degree on an officer's own perception.  The very purpose of warrants is to have a neutral arbiter determine whether inferences drawn from officers' perceptions and circumstantial evidence are sufficient to justify a search.  Regardless of the particulars, the Court's mode of analysis is a dangerous road to venture down.  Historically, our default has been that warrants are required.  This part of the Court's argument instead suggests, without precedent, that their value now has to be proven.

do arise can "better [be] addressed through considera-
tion of case-specific exceptions to the warrant require-
ment." *Riley*, 573 U. S., at \_\_\_ (slip op., at 11); see also
*McNeely*, 569 U. S., at \_\_\_ (slip op., at 15) (opinion of
SOTOMAYOR, J.).

Without even considering the comparative effectiveness
of case-by-case and categorical exceptions, the Court
reaches for the categorical search-incident-to-arrest excep-
tion and enshrines it for all breath tests. The majority
apparently assumes that any postarrest search should be
analyzed under the search-incident-to-arrest doctrine. See
*ante*, at 16 ("In the three cases now before us, the drivers
were searched or told that they were required to submit to
a search after being placed under arrest for drunk driving.
We therefore consider how the search-incident-to-arrest
doctrine applies to breath and blood tests incident to such
arrests").

But, as we explained earlier, police officers may want to
conduct a range of different searches after placing a per-
son under arrest. Each of those searches must be sepa-
rately analyzed for Fourth Amendment compliance. Two
narrow types of postarrest searches are analyzed together
under the rubric of our search-incident-to-arrest doctrine:
Searches to disarm arrestees who could pose a danger
before a warrant is obtained and searches to find evidence
arrestees have an incentive to destroy before a warrant is
obtained. *Chimel*, 395 U. S., at 763. Other forms of
postarrest searches are analyzed differently because they
present needs that require more tailored exceptions to the
warrant requirement. See *supra*, at 4–5 (discussing
postarrest application of the "exigency" exception); see also
*supra*, at 13–14 (discussing postarrest booking and inven-
tory exceptions).

The fact that a person is under arrest does not tell us
which of these warrant exceptions should apply to a par-
ticular kind of postarrest search. The way to analyze

which exception, if any, is appropriate is to ask whether the exception best addresses the nature of the postarrest search and the needs it fulfills. Yet the majority never explains why the search-incident-to-arrest framework—its justifications, applications, and categorical scope—is best suited to breath tests.

To the contrary, the search-incident-to-arrest exception is particularly ill suited to breath tests. To the extent the Court discusses any fit between breath tests and the rationales underlying the search-incident-to-arrest exception, it says that evidence preservation is one of the core values served by the exception and worries that "evidence may be lost" if breath tests are not conducted. *Ante*, at 31. But, of course, the search-incident-to-arrest exception is concerned with evidence destruction only insofar as that destruction would occur before a warrant could be sought. And breath tests are not, except in rare circumstances, conducted at the time of arrest, before a warrant can be obtained, but at a separate location 40 to 120 minutes after an arrest is effectuated. That alone should be reason to reject an exception forged to address the immediate needs of arrests.

The exception's categorical reach makes it even less suitable here. The search-incident-to-arrest exception is applied categorically precisely because the needs it addresses could arise in every arrest. *Robinson*, 414 U. S., at 236. But the government's need to conduct a breath test is present only in arrests for drunk driving. And the asserted need to conduct a breath test without a warrant arises only when a warrant cannot be obtained during the significant built-in delay between arrest and testing. The conditions that require warrantless breath searches, in short, are highly situational and defy the logical underpinnings of the search-incident-to-arrest exception and its categorical application.

\*     \*     \*

In *Maryland* v. *King*, this Court dispensed with the warrant requirement and allowed DNA searches following an arrest. But there, it at least attempted to justify the search using the booking exception's interest in identifying arrestees. 569 U. S., at \_\_\_–\_\_\_ (slip op., at 11–18); *id.,* at \_\_\_–\_\_\_ (slip op., at 4–6) (Scalia, J., dissenting). Here, the Court lacks even the pretense of attempting to situate breath searches within the narrow and weighty law enforcement needs that have historically justified the limited use of warrantless searches. I fear that if the Court continues down this road, the Fourth Amendment's warrant requirement will become nothing more than a suggestion.

# SUPREME COURT OF THE UNITED STATES

———————

Nos. 14–1468, 14–1470, and 14–1507

———————

DANNY BIRCHFIELD, PETITIONER
14–1468　　　　　*v.*
NORTH DAKOTA;

*ON WRIT OF CERTIORARI TO THE SUPREME COURT OF
NORTH DAKOTA*

WILLIAM ROBERT BERNARD, JR., PETITIONER
14–1470　　　　　*v.*
MINNESOTA; AND

*ON WRIT OF CERTIORARI TO THE SUPREME COURT OF
MINNESOTA*

STEVE MICHAEL BEYLUND, PETITIONER
14–1507　　　　　*v.*
GRANT LEVI, DIRECTOR, NORTH DAKOTA
DEPARTMENT OF TRANSPORTATION

*ON WRIT OF CERTIORARI TO THE SUPREME COURT OF
NORTH DAKOTA*

[June 23, 2016]

JUSTICE THOMAS, concurring in judgment in part and dissenting in part.

The compromise the Court reaches today is not a good one. By deciding that some (but not all) warrantless tests revealing the blood alcohol concentration (BAC) of an arrested driver are constitutional, the Court contorts the search-incident-to-arrest exception to the Fourth Amendment's warrant requirement. The far simpler answer to

the question presented is the one rejected in *Missouri* v. *McNeely*, 569 U. S. ___ (2013). Here, the tests revealing the BAC of a driver suspected of driving drunk are constitutional under the exigent-circumstances exception to the warrant requirement. *Id.*, at ___–___ (THOMAS, J., dissenting) (slip op., at 3–4).

I

Today's decision chips away at a well-established exception to the warrant requirement. Until recently, we have admonished that "[a] police officer's determination as to how and where to search the person of a suspect whom he has arrested is necessarily a quick *ad hoc* judgment which the Fourth Amendment does not require to be broken down in each instance into an analysis of each step in the search." *United States* v. *Robinson*, 414 U. S. 218, 235 (1973). Under our precedents, a search incident to lawful arrest "require[d] no additional justification." *Ibid.* Not until the recent decision in *Riley* v. *California*, 573 U. S. ___ (2014), did the Court begin to retreat from this categorical approach because it feared that the search at issue, the "search of the information on a cell phone," bore "little resemblance to the type of brief physical search" contemplated by this Court's past search-incident-to-arrest decisions. *Id.*, at ___ (slip op., at 10). I joined *Riley*, however, because the Court resisted the temptation to permit searches of some kinds of cell-phone data and not others, *id.*, at ___–___ (slip op., at 23–25), and instead asked more generally whether that entire "category of effects" was searchable without a warrant, *id.*, at ___ (slip op., at 10).

Today's decision begins where *Riley* left off. The Court purports to apply *Robinson* but further departs from its categorical approach by holding that warrantless breath tests to prevent the destruction of BAC evidence are constitutional searches incident to arrest, but warrantless blood tests are not. *Ante*, at 35 ("Because breath tests are

significantly less intrusive than blood tests and in most cases amply serve law enforcement interests, we conclude that a breath test, but not a blood test, may be administered as a search incident to a lawful arrest for drunk driving"). That hairsplitting makes little sense. Either the search-incident-to-arrest exception permits bodily searches to prevent the destruction of BAC evidence, or it does not.

The Court justifies its result—an arbitrary line in the sand between blood and breath tests—by balancing the invasiveness of the particular type of search against the government's reasons for the search. *Ante*, at 20–36. Such case-by-case balancing is bad for the People, who "through ratification, have already weighed the policy tradeoffs that constitutional rights entail." *Luis* v. *United States*, 578 U. S. \_\_\_, \_\_\_ (2016) (THOMAS, J., concurring in judgment) (slip op., at 10); see also *Crawford* v. *Washington*, 541 U. S. 36, 67–68 (2004). It is also bad for law enforcement officers, who depend on predictable rules to do their job, as Members of this Court have exhorted in the past. See *Arizona* v. *Gant*, 556 U. S. 332, 359 (2009) (ALITO, J., dissenting); see also *id.*, at 363 (faulting the Court for "leav[ing] the law relating to searches incident to arrest in a confused and unstable state").

Today's application of the search-incident-to-arrest exception is bound to cause confusion in the lower courts. The Court's choice to allow some (but not all) BAC searches is undeniably appealing, for it both reins in the pernicious problem of drunk driving and also purports to preserve some Fourth Amendment protections. But that compromise has little support under this Court's existing precedents.

## II

The better (and far simpler) way to resolve these cases is by applying the *per se* rule that I proposed in *McNeely*.

Under that approach, both warrantless breath and blood tests are constitutional because "the natural metabolization of [BAC] creates an exigency once police have probable cause to believe the driver is drunk.  It naturally follows that police may conduct a search in these circumstances."  569 U. S., at ___–___ (dissenting opinion) (slip op., at 3–4).

The Court in *McNeely* rejected that bright-line rule and instead adopted a totality-of-the-circumstances test examining whether the facts of a particular case presented exigent circumstances justifying a warrantless search. *Id.*, at ___ (slip op., at 1).  The Court ruled that "the natural dissipation of alcohol in the blood" could not "categorically" create an "exigency" in every case.  *Id.*, at ___ (slip op., at 13).  The destruction of "BAC evidence from a drunk-driving suspect" that "naturally dissipates over time in a gradual and relatively predictable manner," according to the Court, was qualitatively different from the destruction of evidence in "circumstances in which the suspect has control over easily disposable evidence."  *Id.*, at ___ (slip op., at 10).

Today's decision rejects *McNeely*'s arbitrary distinction between the destruction of evidence generally and the destruction of BAC evidence.  But only for searches incident to arrest.  *Ante*, at 31–33.  The Court declares that such a distinction "between an arrestee's active destruction of evidence and the loss of evidence due to a natural process makes little sense."  *Ante,* at 31.  I agree.  See *McNeely*, *supra*, at ___–___ (THOMAS, J., dissenting) (slip op., at 5–6).  But it also "makes little sense" for the Court to reject *McNeely*'s arbitrary distinction only for searches incident to arrest and not also for exigent-circumstances searches when both are justified by identical concerns about the destruction of the same evidence.  *McNeely*'s distinction is no less arbitrary for searches justified by exigent circumstances than those justified by search inci-

Opinion of THOMAS, J.

dent to arrest.

The Court was wrong in *McNeely*, and today's compromise is perhaps an inevitable consequence of that error. Both searches contemplated by the state laws at issue in these cases would be constitutional under the exigent-circumstances exception to the warrant requirement. I respectfully concur in the judgment in part and dissent in part.