STATE OF MAINE                                  UNIFIED CRIMINAL DOCKET
CUMBERLAND, ss.                                 No. CR-17-56

STATE OF MAINE

v.                                       ORDER

NATHAN WEARE,

     Defendant

Before the court is a motion to suppress by defendant Nathan Weare. A hearing was held on July 20, 2017. Weare was stopped while driving a vehicle in South Portland at around 1:35 am on New Year's Day and was subsequently charged with operating under the influence of marijuana.

The primary evidence at the hearing consisted of the following: (1) the testimony of Officer Johns of the South Portland Police Department, (2) a video from the cruiser camera of Officer Theriault (State's Ex. 2), which showed the interaction between Officer Johns and Weare at the scene and included some audio, (3) audio from the cruiser camera of Officer Johns (State's Ex. 3) which begins several minutes after Officer Johns approached the Weare vehicle and which lasts until Weare's arrest at the scene, and (4) audio from the cruiser camera of Officer Johns (also State's Ex. 3) covering the time period at the jail from 2:25am until 3:22am.[1]

The State has the burden of proof by a preponderance of the evidence on all of the issues raised by the motion. The court finds as follows:

1. Shortly after midnight on New Year's Day there was a small transformer fire on Highland Avenue between Scamman Street and Plymouth Road in South Portland. South

---

[1] Although Officer Johns's cruiser camera does not show any aspect of the interaction between Officer Johns and Weare, the audio in State's Ex. 3 comes from the body microphone carried by Officer Johns.

R'D CUMB CLERKS OFC
AUG 3 '17 AM9:32

Portland Officers Theriault and Johns set up a roadblock on Highland Avenue to allow the Fire Department to extinguish the fire and for CMP to repair the transformer. Officer Theriault placed his cruiser across both lanes of Highland Avenue at the Scamman Street intersection with his blue lights flashing, and Officer Johns placed his cruiser across both lanes of Highland Avenue at the Plymouth Road intersection with his blue lights flashing.

2. At approximately 1:38am a vehicle driven by Weare approached Theriault's cruiser but did not stop. Instead it went to the left and squeezed past Theriault's vehicle and continued along Highland Avenue even though Theriault flashed his headlights and honked his horn. When the Weare vehicle reached the Plymouth Road intersection, where Highland Avenue was blocked by Officer Johns's cruiser, the Weare vehicle stopped and Officer Johns approached the vehicle. Around that same time, the CMP truck left the scene, and Officer Theriault drove down to where the Weare vehicle had been stopped.

3. There is no audio from the first few minutes of the interaction between Officer Johns and Weare. When Johns approached and asked Weare for his driver's license, registration, and proof of insurance, Johns smelled a strong odor of marijuana. Johns asked Weare whether he had ingested any marijuana or had any marijuana, and Weare told him he had smoked marijuana six hours earlier and voluntarily showed Officer Johns a pipe with burned residue.[2]

4. When Officer Theriault approached the vehicle, Theriault asked Weare why he had passed the roadblock and Weare stated that he had not realized that the road was blocked. When Theriault returned to his vehicle, there was further conversation between Johns and the occupants

---

[2] Johns testified that he thought Weare could not say how long ago he had smoked, but in the audio Johns later tells Theriault that Weare said he had smoked six hours ago. Johns also testified that Weare appeared somewhat disheveled, that he was lethargic, and that his eyes were red. In later conversation between Weare and Johns at the jail, however, Johns appears to acknowledge that Weare's eyes were not red but stated that it did not matter. In addition, Johns's observations that Weare was disheveled and lethargic are not consistent with Weare's appearance on the Theriault videotape when Weare exited the vehicle to perform field sobriety tests.

2

of the vehicle that is not audible but Johns thereafter can be heard demanding "where's the weed?" in a fairly loud manner and threatening to search the car and summons everyone inside if marijuana was found. At that point Weare produced some marijuana and gave it to Johns.

5. Shortly thereafter Officer Theriault asked the passengers in the vehicle for identification and when it turned out that they were minors, Theriault and Johns began attempting to call their parents because of a South Portland ordinance imposing a curfew on minors under 16 or 17 not accompanied by parent or guardian.

6. Johns then asked Weare to step out of the vehicle and performed an HGN test with one addition – Johns moved his finger very close to the bridge of Weare's nose to see if Weare's eyes crossed. At that point Johns observed that Weare's eyes did not cross (lack of convergence) which can be – but is not necessarily – an indicator of impairment from marijuana. Johns did not note any alcohol clues on the HGN test.[3] The HGN test was performed approximately 12 minutes after Officer Johns first approached Weare's vehicle.

7. Thereafter the officers consulted with one another. Theriault stated that he was "just going to kick them loose," but Johns stated that Weare was "still high." Johns then proceeded to a further OUI investigation by administering walk and turn and one leg stand tests. On the walk and turn Weare attempted to start early and had some difficulty with his balance, raising his arms. On the one leg stand Weare was steadier but raised his arms once.

8. Johns then placed Weare under arrest and transported him to the jail. This occurred around 2:02am, approximately 25 minutes after Johns first approached Weare's vehicle. Weare

---

[3] From Officer Johns's testimony the court infers that moving a finger or pen to a point very close to the bridge of a driver's nose to look for lack of convergence is part of training that officers receive to look for indicators of drug impairment. Johns was cross-examined on that training, which has the acronym "ARIDE."

3

was at no time given a Miranda warning after his arrest. The State agreed at the motion hearing that at trial, it would not seek to offer any statements by Weare that were made after his arrest.

9. The record does not reflect exactly when Officer Johns and Weare arrived at the jail but they were at the jail by 2:25am when Officer Johns told Weare that he would perform an intoxilyzer test although he anticipated Weare would blow a 0.00. That test was performed with the expected 0.00 result, and Officer Johns then began seeking an officer certified as a Drug Recognition Expert (DRE) to perform an evaluation of Weare. During the time at the jail Weare and Officer Johns had some discussions that included statements by Weare that he did not feel under the influence and statements by Officer Johns that he had been certified as a DRE in California before joining the South Portland Police Department 9 months earlier and that he was certain Weare was under the influence. All of this discussion, however, was in a conversational tone and Officer Johns was not hostile and did not raise his voice.

10. At around 2:57am Weare inquired what would happen if a DRE officer could not be found and Johns replied that "you'll probably just provide a urine sample." Shortly after 3:05am Officer Johns directly asked Weare whether he was willing to provide a urine sample, and Weare answered "sure." Weare added that he did not think he could urinate with someone watching him. Officer Johns agreed that while the door to the bathroom would be open, Weare would not be watched while he provided a sample. Shortly afterward Officer Johns was informed that no DRE officer was available. Weare provided a urine sample around 3:21am.

11. Although Weare originally stopped his vehicle because the road was blocked by Officer Johns's vehicle, he was detained from the point that Officer Johns approached his vehicle and did not promptly wave him through. However, Officer Johns was entitled to approach Weare's vehicle and make inquiries once Weare had failed to stop for Officer Theriault's vehicle

4

even when Theriault had begun honking his horn. As soon as Officer Johns approached the vehicle and smelled the strong odor of marijuana, he was entitled to further detain Weare to investigate whether he was under the influence.

12. Weare argues that his continued detention after he had produced his license and had explained that he had not realized there was a roadblock violated the U.S. Supreme Court's decision in *Rodriguez v. United States,* 135 S.Ct. 1609 (2015). *Rodriguez* ruled that a traffic stop becomes unlawful if it is prolonged beyond the purpose of the original stop in order for the police to perform a drug investigation. 135 S.Ct. at 1615-16.

13. However, as the Supreme Court noted in *Rodriguez,* the issue in that case was whether police routinely could "extend an otherwise-completed stop, absent reasonable suspicion, in order to conduct a [drug investigation]." 135 S.Ct. at 1614 (emphasis added). Moreover, the *Rodriguez* decision did not suppress the evidence found in the stop but remanded in order to determine whether "reasonable suspicion of criminal activity justified detaining Rodriguez beyond completion of the traffic infraction investigation." 135 S.Ct. at 1616-17.

14. In this case Officer Johns had a reasonable articulable suspicion to continue the detention of Weare and to have him perform field sobriety tests because of (1) Weare's behavior in passing Theriault's vehicle and entering the roadblock area – indicating possible impairment of Weare's judgment; (2) the strong odor of marijuana that Officer Johns perceived as soon as he approached the vehicle; (3) Weare's admission that he had smoked marijuana, albeit six hours ago; and (4) the marijuana pipe with burned residue that Weare showed the officer.

15. Accordingly, the court denies Weare's motion to the extent that Weare seeks to suppress the stop, the evidence obtained during the roadside investigation after the initial

5

interaction between Weare and the officers, and the marijuana pipe that was voluntarily produced by Weare.

16. At the same time Weare's motion to suppress is granted as to evidence of the marijuana that was provided to Officer Johns after Johns demanded, "where's the weed?" and threatened to search the vehicle and summons the occupants. That evidence was not provided voluntarily nor was any consent to search given.

17. The results of the field sobriety tests – the lack of convergence seen at the end of the HGN test, the notable raising of arms during the walk and turn and (less notably) during the one leg stand – when combined with the other information set forth in paragraph 14 constituted probable cause to arrest Weare for OUI. In *State v. Morrison*, 2015 ME 153 ¶¶ 8-9, 128 A.3d 1060, the Law Court found erratic operation, the odor of alcohol, bloodshot eyes, admission to drinking earlier in the evening, and a failure to successfully complete a field sobriety test sufficient to constitute probable cause. In this case there was the passing of a roadblock (or a failure to appreciate that the police were attempting to block the road), the strong odor of marijuana, the display of a marijuana pipe, the admission to smoking six hours earlier, the lack of convergence noted on the HGN test, and a failure to successfully complete the walk and turn test.

18. While Weare argues that he was detained too long at the jail and should have been released before the urine sample, the court is aware of no authority for the proposition that – once a person has been arrested on probable cause – that person has cause to complain because of delay occasioned by the taking of an intoxilyzer test to rule out alcohol and a further delay while a DRE officer is sought.

6

19. The remaining question is whether there is any basis to suppress the urine sample because a warrant was not sought. The issue of whether a warrant would be necessary for a urine sample absent consent poses a difficult issue in light of the Supreme Court's decision in *Birchfield v. North Dakota,* 136 S.Ct. 2160 (2016), on the one hand and the Maine statutes requiring operators to submit to testing for drugs on the other hand. *See* 29-A M.R.S. §§ 2521(1), 2525(1).[4] While the court would be inclined to think that the *Birchfield* analysis requires a warrant for an unconsented urine sample, it does not need to reach that issue in this case because Weare answered "sure" when asked if he was willing to provide a urine sample. At no point during the colloquy at the jail did Weare express any unwillingness to provide a urine sample, only stating as noted above that he did not think he could urinate with someone watching him. The officer agreed that while the door would be open, Weare would not be watched while he provided a sample. The court thus concludes that Weare validly consented to provide a urine sample.

20. At the same time the court is constrained to note that it is aware from numerous other cases that a urine sample can show the presence of THC for a long time after a person has consumed marijuana. A positive urine sample, therefore, would not appear to have any significant probative value in determining whether Weare was in any way impaired by marijuana at the time he was operating his vehicle during the early hours of January 1, 2017.

---

[4] With respect to drugs, 29-A M.R.S. § 2521(1) requires that an operator submit to a test to determine the presence of a drug or a drug metabolite if there is probable cause to believe that the operator was driving under the influence. 29-A M.R.S. § 2525(1) directs operators of vehicles to submit to a blood or urine test if a Drug Recognition Expert has probable cause to believe that the operator of a vehicle is under the influence of a drug. The court would therefore be inclined to interpret sections 2521(1) and 2525(1) as first directing an operator suspected of drug impairment to submit to an evaluation by a DRE and then directing the operator to submit to a blood or urine test if the DRE has probable cause to believe the operator is under the influence of drugs. In the absence of exigent circumstances, however, blood or urine tests would generally require a warrant under *Birchfield.*

7

21. It is also true that some of Officer Johns's statements during his interaction with Weare appear to suggest that the officer believed that Weare's admission that he had smoked marijuana six hours earlier was conclusive proof that Weare was impaired. If so, this would not be correct. Officer Johns was cross-examined with training materials indicating that most behavioral and physiological effects from marijuana use return to baseline within 3-5 hours although some residual behavioral effects can last up to 24 hours. He testified that he believed those training materials were out of date. Johns did acknowledge that the effects of consuming marijuana may vary between drivers. He also testified that he did not necessarily believe a driver who stated that he had last smoked six hours ago because people minimize when talking to law enforcement.

22. The issues raised in paragraphs 20 and 21 are issues for trial. For purposes of the pending motion, it is sufficient that the State has demonstrated by a preponderance of the evidence that there was reasonable articulable suspicion for the stop, that there was reasonable articulable suspicion to continue the detention of Weare for an OUI investigation and field sobriety tests, that there was probable cause for arrest, and that there was consent for a urine sample. Accordingly, as set forth above in paragraph 16, defendant's motion to suppress is granted with respect to all evidence relating to the marijuana that was provided after Officer Johns threatened to search the vehicle. In all other respects the motion to suppress is denied.


Dated: August 2, 2017

Thomas D. Warren
Justice, Superior Court

8