J-A08018-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| RAYMOND SCOTT KING | : | |
| | : | No. 3891 EDA 2016 |
| Appellant | : | |

Appeal from the Judgment of Sentence Entered December 1, 2016
In the Court of Common Pleas of Montgomery County Criminal Division
at No(s):  CP-46-CR-0001074-2016

BEFORE:   PANELLA, J., LAZARUS, J., and STRASSBURGER*, J.

MEMORANDUM BY LAZARUS, J.:                    **FILED JUNE 27, 2018**

Raymond Scott King appeals from his judgment of sentence, entered in the Court of Common Pleas of Montgomery County, following his conviction after a non-jury trial of one count of Driving Under the Influence (DUI) — highest rate of alcohol,[1] and one count of DUI — general impairment.[2]  After careful review, we affirm.

The trial court summarized the relevant facts underlying this case as follows:

> On September 5, 2015, at roughly 10:49 P.M., Officer [Matthew] Musselman ("the affiant") of the Lower Pottsgrove Township Police Department was dispatched to 2596 Pruss Hill Road in Montgomery County, Pennsylvania, upon report of a motor vehicle accident.  The affiant arrived on [the] scene and found [King]

---

[1] 75 Pa.C.S. § 3802(c).

[2] 75 Pa.C.S. § 3802(a)(1).

---

*   Retired Senior Judge assigned to the Superior Court.

sitting in the middle of the road, with his black motorcycle laying nearby. The affiant noticed [King's] bloodshot eyes and detected an alcohol[] odor emanating from his person. However, when asked, [King] told the affiant he had not been drinking. The affiant also observed blood on the seat of [King's] motorcycle and on his pants.

First responder to the scene, Matthew Burfete ("the paramedic"), testified at the December 1, 2016, bench trial as to his observations of the scene of [King's] motorcycle accident and the resulting injuries on September 5, 2015. The paramedic was a firefighter and paramedic for about five (5) years at the time of the incident, and in that time had previously encountered and became familiar with the effects of alcohol on a person. The paramedic found [King] in the middle of the roadway and his motorcycle lying on its side nearby in a ditch. According to the paramedic, [King] acted, 'slightly confused and somewhat uncooperative[,]' while he was being examined for injuries. [King's] injuries included a right femur fracture and a dislocation or fracture of the right knee; yet, [King] initially refused any offer to help him stand and be placed onto the litter ('gurney'), insisting he be allowed to do so himself. The paramedic testified individuals who suffer the type of injury [King] suffered typically are unwilling, not to mention unable, to stand, as the case ultimately turned out to be for [King]. [King] was eventually convinced to allow paramedics to help him onto the gurney and in the back of the ambulance, after which paramedics more thoroughly examined [King] and obtained his vital signs. While en route to the hospital the paramedic spoke with [King] to determine, *inter alia*, how the accident occurred and whether [King] had been drinking. [King] admitted to drinking two (2) glasses of wine to the paramedic, which contrasted with his previous statement to the affiant that he had not been drinking anything[.]

At the end of his direct examination, the paramedic testified that based upon his observations, i.e., odor of alcohol; bloodshot, glassy eyes; strange, uncooperative behavior, it was his belief [King] was intoxicated on the night of the incident, September 5, 2015.

[King] was taken to nearest trauma center at West Reading Hospital, approximately thirty (30) to forty (40) minutes away from the scene of the accident. The affiant was stationed outside [King's] hospital room, whereupon he observed an intravenous (IV) line in [King's] arm and medical personnel with several vials

- 2 -

of [King's] blood (from a blood draw conducted by the hospital in treating [King's] injuries) inside the trauma bay. Later, when the affiant was able to enter [King's] hospital room, he read to [King] the DL-26 form containing an enhancement penalty clause for refusal to submit to blood testing, after which [King's] blood was drawn ("'legal' blood draw"), this at the affiant's direction; then placed in signed, sealed vials and given to the affiant to be sent to a lab for further testing. [King's] blood was first drawn at the hospital's direction for medical treatment purposes in accordance with hospital procedure ("'medical' blood draw"), before [King] was read the DL-26 form.

The separate, 'legal' blood draw was conducted subsequent to the DL-26 form being read to [King], (again, the 'medical' blood draw preceded this 'legal' blood draw); the affiant collected the vials of blood from that 'legal' blood draw; and sent the samples to an independent lab for further testing. The affiant specifically recalled the procedure in Montgomery County at the time was, in fact, to place collected blood vials in kits to be sent to a lab for the appropriate testing, as opposed to the hospital testing the blood-alcohol concentration ("BAC") of individuals at the hospital. The trial court asked the affiant to clarify for the record, as follows:

> [THE COURT]: Officer, let me just make sure I understand. The blood that you had taken as the result of the DL-26—
>
> [THE WITNESS]: Yes?
>
> [THE COURT]: -- did you take that blood with you for testing or was that testing done at the hospital?
>
> [THE WITNESS]: No. That was taken with me back to the station.

The affiant received vials of [King's] blood taken from the 'legal' blood draw at 12:41 A.M. on September 6, 2015.

Trial Court Opinion, 8/7/17, at 1-4 (internal citations and footnotes omitted).

On July 12, 2016, King filed his first motion to suppress, objecting to the admission of the results of the 'legal' blood draw that was conducted

pursuant to the DL-26 form. In this first motion, King argued that, pursuant to *Birchfield v. North Dakota*, 136 S. Ct. 2160 (2016),[3] the warrantless blood draw was unconstitutional, because there were no exigent circumstances to overcome the warrant requirement and King's consent to the 'legal' blood draw was coerced by the threat of enhanced criminal penalty in the pre-*Birchfield* DL-26 form.

Because of the challenge to the 'legal' blood draw, the affiant prepared and filed the first search warrant application and an affidavit of probable cause on July 27, 2016, seeking the results of the 'medical' blood draw that was ordered by the hospital in conjunction with its treatment of King. Though it contained irrelevant references to the affiant's training and familiarity with illegal controlled substances, the affidavit primarily consisted of the facts and circumstances surrounding the September 5, 2015 motorcycle accident. Specifically, observations of King's bloodshot, glassy eyes, the scent of alcohol coming from him, and King's admission to drinking before the crash served as probable cause to search the medical records from West Reading Hospital. The first search warrant (the "July Warrant") was executed on the same day, seizing the results of King's 'medical' blood draw, which had to be sent to NMS

---

[3] In *Birchfield*, the United States Supreme Court held that because the taking of a blood sample is a search within the meaning of the Fourth Amendment to the Constitution, police officers may not compel the taking of a blood sample without a search warrant. *Birchfield*, 136 S. Ct. at 2184. The *Birchfield* court found laws that impose criminal penalties for refusing to consent to a blood test are unconstitutional because "motorists cannot be deemed to have consented to submit to a blood test on pain of committing a criminal offense." *Id.* at 2185.

Labs to be converted from ethanol to blood alcohol concentration. The toxicology report from NMS Labs reflects the conversion to blood alcohol concentration, which was at the high rate of 0.272%.

On August 11, 2016, a suppression hearing was held on King's July 12, 2016 motion to suppress the blood results derived from the 'legal' blood draw. The trial court granted King's motion, reasoning the 'legal' blood draw conducted on King pursuant to the DL-26 form was unconstitutional in accordance with the United States Supreme Court's holding in **Birchfield**.

On August 17, 2016, King filed his second motion to suppress, this time seeking to suppress the results of the 'medical' blood draw seized through the July Warrant. In his second motion, King argued the July affidavit of probable cause contained "misleading and/or inaccurate information" that the magisterial district judge used to form the basis for the issuance of the search warrant and that the results of the 'medical' blood draw were "fruit of the poisonous tree" suppressed by the trial court at the first suppression hearing on August 11, 2016.

Because of King's challenges to the July Warrant, on September 17, 2016, the affiant filed a second search warrant application and affidavit of probable cause. Therein, the affiant sought additional medical records in order to assist the Commonwealth in proving the 'medical' blood draw was legitimately conducted by medical personnel for purposes of independent medical treatment and the results thereof were not fruit of the warrantless 'legal' blood draw. The September affidavit contained the same observations

to support probable cause as the July affidavit, though the September affidavit omitted the irrelevant information and immaterial references to illegal drugs included in the July affidavit, i.e., the affiant's law enforcement background in investigating illegal controlled substances crimes, and a note about Reading Hospital's "common practice . . . to test a patient's blood for alcohol and or illegal narcotics." N.T. Suppression Hearing, 11/9/16, at 53-56, 60. A warrant was issued pursuant to the September 17, 2016 application (the "September Warrant") on the same day. The September Warrant authorized the seizure of the relevant records, which indicated the ethanol test of King's blood was ordered by medical personnel, Elaine Miller, R.N., for the purpose of safely treating King's extensive injuries.

On November 7, 2016, King filed his third motion, seeking to suppress his medical records documenting the parties responsible for ordering the 'medical' blood draw, and the reasoning for same. In this third motion to suppress, King argued the September affidavit of probable cause, like the July affidavit, contained "misleading and/or inaccurate information" that the magisterial district judge used to form the basis for the issuance of the subsequent search warrant, and that specific medical records were "fruit of the poisonous tree" suppressed by the trial court at the first suppression hearing on August 11, 2016.

On November 9, 2016, a second suppression hearing was held to address King's second and third motions to suppress the results of the 'medical' blood draw, seized upon the execution of the July Warrant, and the

medical records documenting the parties responsible for ordering the 'medical' draw and the reasoning for same, which were seized upon the execution of the September Warrant. After the hearing, the trial court concluded that the 'medical' and 'legal' blood draws were separate and distinct, the first being legitimately conducted for medical treatment purposes, and the latter being done for purposes of criminal prosecution and pursuant to the DL-26 form. Trial Court Opinion, 8/7/17, at 8. Therefore, King's second and third motions to suppress were denied.

After a bench trial before the Honorable Gail A. Weilheimer on December 1, 2016, King was found guilty of driving under the influence — highest rate of alcohol and driving under the influence — general impairment. The court sentenced King to seventy-two (72) hours' to six (6) months' imprisonment, and ordered him to submit to both Court Reporting Network and drug and alcohol evaluations, to comply with subsequent treatment recommendations, to attend safe-driving school, and to surrender his driver's license to the clerk of courts.

King filed a timely notice of appeal and court-ordered Pa.R.A.P. 1925(b) concise statement of errors complained of on appeal. On appeal, King presents the following issues for our consideration:

> 1. Whether the trial court erred in denying [King's] [m]otion to [s]uppress because the affidavit of probable cause used to obtain the July 27, 2016 search warrant contained material misstatements of fact which caused the neutral and detached magistrate to erroneously believe that [King] was under investigation for driving under the influence of illegal drugs?

2. Whether the trial court erred in denying [King's] [m]otion to [s]uppress because the affidavit of probable cause used to obtain the September 17 [sic], 2016 search warrant was misleading and the evidence obtained through this warrant was not from an independent source?

3. Whether the evidence at trial was insufficient to prove [King] guilty [of DUI — highest rate] beyond a reasonable doubt where the Commonwealth produced no evidence to prove the time at which the accident occurred, and if [King's] medical records are suppressed by this Court, the Commonwealth produced no evidence to prove [King's] blood alcohol concentration?[4]

Appellant's Brief, at 5.

Our standard of review when assessing a challenge to the denial of a motion to suppress is well-established. Review is limited to whether the record supports the suppression court's factual findings and whether the legal conclusions drawn from those facts are correct. ***Commonwealth v. Jones***, 988 A.2d 649, 654 (Pa. 2010). Where the record supports the factual findings of the suppression court, we are bound by those findings and reverse only if the court's legal conclusions are erroneous. ***Id.*** When the appeal of the determination of the suppression court turns on allegations of legal error, the legal conclusions of the suppression court are not binding on the appellate court, which must determine if the law was properly applied to the facts. ***Id.***

In essence, King attacks the trial court's denial of his motions to suppress on the grounds that the affidavits of probable cause for both search warrants contained material misstatements of fact that should invalidate the warrants. Misstatements of fact in a search warrant affidavit will invalidate

---

[4] King does not challenge his DUI — general impairment conviction.

a search and require suppression only if they are deliberate and material. ***Commonwealth v. Mickell***, 598 A.2d 1003, 1010 (Pa. Super. 1991); ***see also Commonwealth v. Zimmerman***, 422 A.2d 1119, 1124 (Pa. Super. 1980) ("appellant must establish that the police (1) made a misstatement, which is both (2) deliberate and (3) material"). A material fact is one "without which probable cause to search would not exist." ***Commonwealth v. Minoske***, 441 A.2d 414, 418 (Pa. Super. 1982). In deciding whether a misstatement is material, the test is if the misstatement is essential to the affidavit. ***Mickell***, 598 A.2d at 1010. In order to determine whether the misstatements are essential, they must be deleted from the application, and if probable cause still exists within the affidavit, the misstatements are immaterial. ***Commonwealth v. Yucknevage***, 390 A.2d 225, 227 (Pa. Super. 1978).

Here, King objects to the inclusion of the affiant officer's employment background and familiarity with illegal substances, because the affiant only suspected King of driving under the influence of alcohol, not a controlled substance. Appellant's Brief, at 25-26. The July 27, 2016 affidavit contained seven (7) references to illegal drugs, while the September 17, 2016 affidavit contained four (4), which King deems "still too many." ***Id.*** at 34. King claims that these "misleading" references caused the magisterial district judge to believe King was under investigation for illegal drugs. ***Id.*** at 21-25. King asserts the misstatements were material and, by omitting them, probable cause to search King's medical records did not exist. We disagree.

The alleged "defects" in the July 27, 2016 warrant's affidavit of probable cause were not essential because without them, probable cause remained. *Yucknevage*, *supra*. The statements included in the affidavit were not deliberate; the affiant, himself, classified the references to his experience with illegal controlled substances, which were irrelevant to King's case, as "clerical errors." N.T. Suppression Hearing, 11/9/16, at 67, 69. Without the statements regarding the affiant's background and the hospital's typical practices of testing for alcohol and illegal controlled substances, the affidavit still contained descriptions of King's bloodshot, glassy eyes, the scent of alcohol emanating from him, and King's admission to drinking before the crash. The affiant made an immaterial error by including his experience with controlled substances in the July 27, 2016 affidavit, and, without those statements, probable cause remained to search King's medical records for blood tests and his blood alcohol concentration.

Because the September 17, 2016 affidavit of probable cause listed these same factual underpinnings, with fewer references to illegal drugs, probable cause also existed for the issuance of the second search warrant. Further, the September Warrant sought additional information, specifically, the medical personnel responsible for the draw and the reasons for same. The affiant applied for this second warrant after the challenge to the July Warrant, in order to assist the Commonwealth in proving the 'medical' blood draw was distinct from the 'legal' blood draw. This court has held that results from blood draws conducted for independent medical treatment of DUI suspects, which

are seized through a validly obtained and executed search warrant, should not be suppressed. **Commonwealth v. Miller**, 996 A.2d 508, 515-16 (Pa. Super. 2010). On appeal, King does not dispute that the 'medical' blood draw was legitimately conducted for independent medical treatment. Because the 'medical' blood draw was legitimately conducted for the purpose of independent medical treatment, the trial court did not err in denying King's motions to suppress.[5]

Finally, King argues the evidence was insufficient to prove beyond a reasonable doubt that his blood alcohol concentration was in the highest rate within two hours of the accident.[6] Appellant's Brief, at 47-61. We find this argument to be meritless.

In assessing the sufficiency of the evidence, we must view "all evidence and reasonable inferences therefrom in the light most favorable to the Commonwealth, as the verdict winner, and consider whether the trier of fact could have found that each element of the offense charged was supported by evidence and inference[s] sufficient to prove guilt beyond a reasonable doubt." **Commonwealth v. Brown**, 701 A.2d 252, 254 (Pa. Super. 1997)

---

[5] King claims that because the warrants are invalid, the Commonwealth cannot prove his blood alcohol concentration beyond a reasonable doubt. Given our finding that the warrants were valid, we do not need to address this part of his sufficiency claim.

[6] (As required to support a conviction for DUI — highest rate of alcohol under 75 Pa.C.S. § 3802(c)). Although the Commonwealth argues that the issue of timing has been waived, we find that the issue has been preserved for our review. **See**, Appellant's Concise Statement, 2/3/2017.

(citations omitted). The Commonwealth "may sustain its burden by proving the crime's elements with evidence which is entirely circumstantial and the trier of fact, who determines credibility of witnesses and the weight to give the evidence produced, is free to believe all, part, or none of the evidence." *Id.*

Here, the evidence adduced at trial demonstrated the following: the affiant received a call at 10:49 P.M. from dispatch, which came after a witness reported a one-vehicle motorcycle accident; the affiant arrived on the scene to find still-wet blood on the seat of the motorcycle and pooled beneath King, indicating the accident had occurred recently; and, after the paramedic team transported King to West Reading Hospital, the 'medical' blood draw was ordered at 11:55 P.M., only one hour and six minutes after the call to the affiant. This blood draw showed a blood alcohol concentration of 0.272%. From these circumstances, it was reasonable for the trial court to infer that King's blood alcohol concentration was above the highest rate of alcohol[7] within two hours of operating his motorcycle. Accordingly, King's sufficiency claim is meritless.

Judgment of sentence affirmed.

_____

[7] *See* 75 Pa.C.S. § 3802(c) (classifying a blood alcohol concentration of 0.16% or higher as the highest rate of alcohol).

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 6/27/18